ROBINS & WEILL, INC., Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. C-7-G-72.

United States District Court,
M. D. North Carolina,
Winston-Salem Division.

Oct. 11, 1974.

Sidney J. Stern, Jr., Robert O. Klepfer, Jr., Greensboro, N. C., for plaintiff.

N. Carlton Tilley, Jr., U. S. Atty., Greensboro, N. C., Fred Luyties, Tax Div., Dept. of Justice, Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HIRAM H. WARD, District Judge.

This case came on for trial before the Court, the parties having waived their right to a jury, on July 22 and 23, 1974. The plaintiff, Robins & Weill, Inc.,

(Robins), has brought this action for a refund of corporate income taxes which the defendant, United States of America, is alleged to have erroneously and illegally assessed and collected for the taxable years ending December 31, 1965, and December 31, 1966. In those tax years, plaintiff included as a depreciation deduction under 26 U.S.C. § 167 amounts representing a portion of the cost of covenants of noncompetition and insurance accounts or expirations purchased by the plaintiff. The Commissioner of Internal Revenue for the defendant determined that the claimed depreciation deduction for the purchase of insurance expiration lists and covenants of noncompetition were not amortizable or depreciable under Section 167 of the Internal Revenue Code. The plaintiff paid the full amount of the deficiencies found to be owing by the Internal Revenue Service (I.R.S.).

Robins filed timely claims for a refund with the I.R.S. and received notice from the U. S. Treasury Department advising it that the claims for refund had been disallowed entirely. The plaintiff instituted this action under the provisions of 28 U.S.C. § 1346(a)(1).

After weighing the evidence in the case and carefully considering the entire record, including the briefs and oral arguments of able counsel for both parties, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Robins & Weill, Inc., is a duly organized North Carolina Corporation doing business as a property and casualty insurance agency from its offices in Greensboro, Siler City, and Asheboro, North Carolina. C. L. Weill, Jr., is president and chief executive officer, and John P. Young, III, is a vice-president in charge of Robins' insurance department.

2. Robins, in transacting business as a property and casualty insurance agency, writes and maintains insurance policies for its customers in several lines, including homeowners, automobile, general liability, workmen's compensation, and fire and casualty insurance coverages. These lines of insurance are normally written for a one year term and are generally cancelable annually by the customer.

3. Insurance accounts maintained by property and casualty insurance agencies are known in the insurance industry as "expirations." Expirations consist of account information relating to a customer's name, address, and the nature of his insurance coverage with the agency, i.e., name of the carrier(s), type and number of lines, expiration (renewal) dates, premium amounts and schedules, payment ledgers, reports, and a summary of policy terms. The actual written memoranda containing the above information in physical possession of the insurance agency are termed "insurance dailies." The value of expiration lists as a source of information alone is nominal. The expirations' real value is that they enable an insurance agency to contact each policyholder at or near the expiration of the insurance coverage with full knowledge of the type, terms, and history of the existing coverage. This knowledge enables pinpoint solicitation of insurance customers at a time when they are good renewal prospects.

### A. Sharpe Agency Purchase

4. On April 1, 1964, Robins entered into an agreement with Alma Sharpe Garlow for the purchase of the expirations of the Terry D. Sharpe Agency in Greensboro. As sole proprietor of the agency, Mrs. Garlow offered property and casualty insurance to her customers with the type of accounts being primarily personal as opposed to commercial. The Sharpe Agency accounts and records were in good order at the time of the purchase.

5. Mrs. Garlow had been working in the insurance business since 1934 and had been in Greensboro since 1946 managing the insurance agency. Her personal contact with customers in the selling of insurance accounts was largely responsible for the success of the agen-

cy. Mrs. Garlow had no employees and was alone in the business after her father died in 1957.

6. Mr. John P. Young, III, Vice-President of Robins & Weill, Inc., and Officer in Charge of the insurance department, handled the negotiations with Mrs. Garlow for the purchase of the Sharpe Agency. Mrs. Garlow told Mr. Young she fixed the sale price of the agency at twice the amount of the commissions for the previous twelve months. After a review of the status of Mrs. Garlow's expirations, Mr. Young agreed to the above formula, and the parties determined the sale price to be $11,500.

7. Prior to signing the contract for sale of the Sharpe Agency, Mrs. Garlow was aware that the contract contained a covenant prohibiting her from engaging in the insurance business in the Guilford County area for five years. The inclusion of this covenant in the sale contract increased substantially the amount Robins was willing to offer Mrs. Garlow to purchase her business.

8. Mrs. Garlow understood the $11,500 purchase price to be payment for the entire business and not to be a sum of portions allocated between expirations and the covenant not to compete. Mr. Young, in negotiating the purchase of the Sharpe Agency with Mrs. Garlow for Robins, also stated that there was no specific discussion as to allocation of price between the covenant not to compete and the expirations.[1] Neither party intended at the time of purchase to allocate any specific portion of the purchase price to the covenant not to compete.

9. After the purchase of the Sharpe Agency, Robins did not separate the amount paid for expirations and the covenant not to compete on its books, but claimed depreciation on its 1964 and 1965 income tax returns for a portion of the amount paid for both items over a five-year period. (Later claim was made by Robins to depreciate the purchase price over a seventeen-year period.)

10. The purchase of goodwill was not specifically bargained for by either party in the Sharpe transaction and the normal indicia of goodwill were not present in the transfer inasmuch as Mrs. Garlow operated a one personality business.

11. Mrs. Garlow was not retained, and she had no staff personnel to be retained for subsequent employment by Robins. The Terry D. Sharpe Insurance Agency name was not retained by Robins after the sale. The location of the Sharpe Agency and the telephone number listings were not retained by Robins. The Greensboro area, in which the Sharpe Agency operated, was not a new geographical area of entry for Robins

1. The cross-examination of Mr. John Young by the defendant's attorney elicited the following answers:

Q (By Mr. Bailess) Now I believe you said that you participated in negotiations for the purchase of the Sharpe Agency?

A (By Mr. Young) Yes.

Q How did you say the price was arrived at in that case?

A I believe that Alma had already set her price, that she announced what she wanted to sell it for. I don't remember—There was no—To my recollection, there was no discussion with Alma saying, "I want to sell it for three times," and us coming back and offering something else. I don't remember any negotiations on the price.

I think she had announced that she wanted two times and we paid that.

Q Well, how much did she want for a covenant not to compete?

A I don't know that an amount was ever placed on the covenant specifically.

Q Well, what was the amount that she gave as her asking price—what was that for?

A Well, it would be for the expirations—which is really all we were getting—and a covenant.

Q Just a package deal then?

A Yeah. Uh-huh.

Q You said you discussed a covenant with her prior to the time the contract was—the written instrument was prepared?

A Right.

Q But she didn't say she wanted a specific price for the covenant when you mentioned it to her?

A No; it was all—as I remember, there was no specific discussion as to any allocation of price or anything.

since Robins was a long-established and well-recognized insurance agency in Guilford County.

12. At the request of Robins subsequent to the execution of the purchase agreement, Mrs. Garlow signed and sent letters to her customers informing them of a "merger" between the Sharpe and Robins Agencies.

13. A total of 293 accounts were included in the purchase of the Terry D. Sharpe Agency. Undisputed statistics maintained by Robins on the actual realized Sharpe Agency account attrition show an annualized decline of 5.5 percent. This decline of accounts randomly composed of largely personal and some commercial lines of coverage is representative of the account attrition experienced by property and casualty insurance agencies generally.

14. Dr. E. J. Leverett, CPCU, CLU, is an expert in the field of property and casualty insurance account attrition (persistency research) in insurance agencies. Dr. Leverett, being familiar with the method of operation at Robins and based on his independent studies in this area, concluded the limited useful life of the Sharpe Agency accounts was between seventeen and eighteen years after the date of purchase. Dr. Leverett readily admitted he arrived at this figure without considering the age of the customers or the effect of customer referrals, which are factors in determining the value of the expirations to an insurance agency. However, Dr. Leverett did state that reasonably accurate figures on account persistency could be ascertained by use of account statistics and the above nonincluded factors would not significantly affect the reasonable accuracy of the calculations.

15. The limited useful life of the Sharpe Agency expirations, which can be estimated with reasonable accuracy, is seventeen and one-half years.

16. The Sharpe Agency expirations are an intangible capital asset of Robins.

B. *Wood Agency Purchase*

17. In 1965 Robins became interested in purchasing the Wood Insurance Agency in Asheboro, North Carolina. Robins' operation was, at that time, active only in the area of Greensboro, North Carolina, and acquisition of the smaller Wood Agency provided entry into a new geographical market area for Robins.

18. Robert W. Wood had incorporated the Wood Insurance Agency, and he was the president and controlling stockholder in the corporation. He had been engaged in the insurance business for forty-three years and had operated the Wood Agency as a property and casualty insurance agency for thirty-three years, thirteen years at the same location in Asheboro. By 1965 the rigors of the insurance business forced Mr. Wood to seek retirement and consequently he began a search for a purchaser for his agency.

19. Mr. Wood communicated his desire to sell the Wood Agency to an insurance agency broker in Chicago who contacted C. L. Weill, Jr., President of Robins. Mr. Weill, in turn, contacted Mr. Wood and began negotiations for the purchase of the Wood Agency. Mr. Wood sought to sell his entire business which included expirations, goodwill, furniture and equipment, and his inventory of books, records, and supplies.

20. The parties agreed to a sale price formula of one and three-fourths of the annual commissions of the Wood Agency, and the sale price was determined to be $61,634.10. On March 12, 1965, the contract of sale was executed between Robins and the Wood Insurance Agency, Inc. The written contract was executed by Mr. C. L. Weill, Jr., President of Robins & Weill, Inc., and Mr. R. W. Wood, President of Wood Insurance Agency. The parties discussed and included in the sale contract a covenant by which Wood agreed not to compete with Robins in the insurance business in Randolph County for a period of five years after the execution of the contract. The

inclusion of this clause was a necessary inducement for Robins to enter into the contract to purchase the Wood Agency. The parties allocated the sale price among four categories of assets purchased from the Wood Agency: (1) Inventory of books, records, and supplies, $100.00; (2) Furniture, fixtures, and equipment, $1,500.00; (3) Commissions to become due, $60,024.10; and (4) Trade name and goodwill, $10.00.

21. The allocation of $60,024.10 to the heading "Commissions to become due" was intended by the parties to include payment for the expiration lists of the Wood Agency and also to cover payment for the covenant not to compete given by Mr. Wood running in favor of Robins. The parties did not intend, at the time of contracting, to allocate any specific amount of the purchase price to the expirations or insurance accounts separate from the amount paid for the covenant not to compete.

22. The customer mix of the Wood Agency was composed of about forty percent personal accounts and sixty percent commercial accounts in 1965. In the early years of the Wood Agency, Mr. Wood had personally cultivated and maintained a large portion of the clientele which the agency served in 1965. By that time the agency was generating little new business and was concentrating on servicing existing accounts.

23. Mr. Wood had three employees in the Wood Agency operation. Jim King had been with the agency for five years and was actively handling most of its business requiring traveling and personal customer contacts outside the agency's office. In performing the leg work for the business, Mr. King had become acquainted with many of Wood's customers. The agency also employed Mrs. W. G. Lewis to handle most of the routine billing and recordkeeping. Mrs. Lewis had been employed by the agency for thirteen years. The agency also employed Mrs. Hedrick in a secretarial capacity. Mrs. Hedrick had been in the employ of the Wood Agency for only a short period at the time of sale.

24. After the purchase of the Wood Agency, Robins prepared a letter for the signature of Mr. Wood informing customers of the "merger" of Wood Agency with Robins and Weill, Inc. During the negotiations, Mr. Weill insisted that an essential part of the sale transaction would entail Mr. Wood's agreement to accompany Mr. Young, Vice-President of Robins, on courtesy visits to all of Wood's substantial account customers. On these visits Young was introduced by Wood to the customers and Young took the opportunity to explain the benefits offered by the "merger" of the Wood and Robins agencies.

25. In an effort to retain customer association with the Wood Agency, Robins maintained the Wood Agency office location in Asheboro, North Carolina, until 1974. Robins also retained the Wood Insurance Agency trade name on the office signs, stationery, billing notices, advertisements, and in answering the office telephone. In a further effort to retain Wood Agency customer goodwill, Robins continued the employment of Mr. King, Mrs. Lewis, and Mrs. Hedrick.

26. Mr. Young reported to Mr. Weill that, in his estimation, Mr. King was a "key man" in the deal to purchase the Wood Agency. Young believed the retention of King's services would provide customer security and personnel continuity during the period of transition of ownership from the Wood Agency to the Robins Agency. King was, in fact, made manager of the Asheboro operation of Robins shortly after acquisition of the Wood Agency in 1965 and remained with Robins until 1972. Mrs. Lewis remained employed in the Robins' Asheboro office up to the time of trial. Mrs. Hedrick left shortly after her employment by Robins.

27. Some customers of the Wood Insurance Agency made premium payments to Mr. Wood or contacted him on insurance matters long after the date of the sale of his agency. Mr. Wood referred such persons to Robins even though he was under no contractual obli-

gation to do so. Robins did not formally contract with Mr. Wood for this service or retain his services after the sale.

28. The value of the goodwill transferred from the Wood Agency to Robins substantially exceeded the $10.00 allocation made by the parties in the contract of sale.

29. On April 1, 1965, the Wood Agency transferred a total of 1,450 customer accounts to Robins per the sale agreement. Undisputed statistics maintained by Robins on the actual realized Wood Agency account attrition show an annualized decline of 4.5 percent. This decline of accounts randomly composed of personal and commercial lines of coverage is representative of account attrition experienced by property and casualty insurance agencies generally. Dr. Leverett, an expert in the field (see Finding of Fact 14), being familiar with the operation of Robins and based on his studies in this area, concluded that the limited useful life of the Wood Agency accounts was twenty years after the date of purchase.

30. The limited useful life of the Wood Agency accounts, which can be estimated with reasonable accuracy, is twenty years.

31. The Wood Agency expirations are an intangible capital asset of Robins.

### Discussion

The issue raised by this action is whether. under the facts of this case, an amount paid for insurance expiration lists and a covenant not to compete is depreciable under Section 167 of the Internal Revenue Code.

Section 167 of the Internal Revenue Code of 1954 allows depreciation of certain property and states:

> There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
>
> (1) of property used in the trade or business, or

> (2) of property held for the production of income.

26 U.S.C. § 167(a).

Intangible assets may be depreciated under Section 167 as a wasting capital asset if certain requirements are met. The Treasury Department has determined that depreciation of an intangible asset is allowable "[i]f an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy . . .. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill." Treasury Regulation § 1.-167(a)–3 (1956).

### I. Limited Useful Life of Insurance Expiration Lists

The threshold question contested by the parties in this case is whether the expiration lists purchased by Robins from the Sharpe and Wood Agencies had a limited useful life which was reasonably ascertainable. The plaintiff offered evidence which it contends leads to the conclusion that the Sharpe and Wood expirations were wasting capital assets with a limited useful life. The defendant contends that insurance expirations are inextricably linked to goodwill and, therefore, they do not have any reasonably ascertainable life-span. While the defendant concedes that customers on the expiration lists are lost to the purchasing insurance agency over the years due to relocation, death, dissatisfaction, changing needs, and a host of other reasons, the defendant maintains that these variables were not adequately considered by the plaintiff so as to permit formulation of reasonably accurate depreciation rates for the expiration lists. In addition, the defendant presses the argument that the expiration lists had no ascer-

tainable value apart from the goodwill transferred by the selling agencies.

■ In determining whether expiration lists can be depreciated under Section 167 as an intangible asset, the taxpayer must bear the burden of proof to show entitlement to the deduction. Welch v. Helvering, 290 U.S. 111, 54 S. Ct. 8, 78 L.Ed. 212 (1933). The test which the taxpayer must meet is succinctly set forth in Houston Chronicle Publishing Co. v. United States, 481 F. 2d 1240 (5th Cir. 1973). In that case newspaper subscription lists were claimed to be depreciable intangible capital assets. The Court of Appeals for the Fifth Circuit ruled that the government's position that the subscription lists were nonamortizable as a matter of law was untenable under Section 167 of the Internal Revenue Code and the relevant Regulations. The court stated that the lists could be depreciated for tax purposes if the taxpayer sustained his burden of proving that the lists (1) have an ascertainable value separate and distinct from goodwill, and (2) have a limited useful life, the duration of which can be ascertained with reasonable accuracy.

The court in *Houston Chronicle* refused to apply a *per se* rule of nondepreciability to subscription lists on the basis of the "mass asset" rule. The court advanced the opinion that the rule has been applied to deny amortization where arguably distinct assets are "inextricably" linked to goodwill, citing Winn-Dixie Montgomery, Inc. v. United States, 444 F.2d 677 (5th Cir. 1971). However, the court points out that the "mass asset" rule has most frequently been used to deny amortization in cases that involve evidentiary failures on the part of the taxpayer. Marsh & McLennan, Incorporated v. C.I.R., 420 F.2d 667 (3rd Cir. 1969); Thrifticheck Service Corporation v. C.I.R., 287 F.2d 1 (2d Cir. 1961); Ralph W. Fullerton v. United States, 381 F.Supp. 1353 (D.C.Or. 1974). The Fifth Circuit concludes:

Judicial tolerance compels us to say that many jurists and scholars could diagnose tax non-depreciability in the muscles and tendons of list transactions. We reject, however, the establishment of a *per se* rule and a monolithic "mass asset" theory that would amalgamate all subscriptions lists with goodwill.

Houston Chronicle Publishing Co. v. United States, *supra*, 481 F.2d at 1253.

■ Following this logic, the depreciability of expiration lists is a factual question to be decided after the taxpayer has been given an opportunity to meet the dual test laid down in *Houston Chronicle, supra*. In the present case Robins has offered ample evidence (See Findings of Fact 13, 14, 15, 29, and 30) to meet his burden of proof on the issue of limited life of the expiration lists. The duration of the expiration lists of the Sharpe and Wood Agency can be ascertained with reasonable accuracy based on the detailed records and statistics of Robins regarding the loss of accounts over the years from the lists. Additionally, expert testimony has indicated reliability in the current state of the art of insurance account persistency projections, and such projections for the Wood & Sharpe expirations square with the statistics compiled by Robins on depreciation actually experienced by the agency.

The government objects to the data on account persistency claiming such was acquired after the fact of the sale of the expirations and was compiled after the filing of tax returns. Such argument lacks merit inasmuch as *any* depreciability schedule is merely the taxpayer's estimate of duration and usefulness determined with a reasonable degree of accuracy. The plaintiff has satisfied this requirement on the basis of the facts presented at the trial. "Extreme exactitude in ascertaining the duration of an asset is a paradigm that the law does not demand. All that the law and regulations require is reasonable accuracy in

forecasting the asset's useful life." *Houston Chronicle, supra,* at 1253–1254. Therefore, this Court concludes that the limited useful life of the Sharpe Agency expirations was seventeen and one-half years and the limited useful life of the Wood Agency expirations was twenty years.

## II. *Value of Goodwill and Expiration Lists*

The next burden which the plaintiff taxpayer must carry in order to establish depreciability of the expiration lists is to show that it has an ascertainable value separate and distinct from goodwill. The reason for this is obvious inasmuch as goodwill is not depreciable in any event under Treasury Regulation § 1.167(a)–3 (1956). Dodge Brothers v. United States, 118 F.2d 95 (4th Cir. 1941). Goodwill is a nondepreciating capital asset due to the impossibility of determining its limited useful life. Goodwill is defined in many different factual settings with familiar definitions being "The nature of goodwill . . . [is the expectancy that] . . . the old customers will resort to the old place." C.I.R. v. Killian, 314 F. 2d 852, 855 (5th Cir. 1963). "The essence of goodwill is the expectancy of continued patronage, for whatever reason." Tomas v. Commissioner, 50 T.C. 247, 256 (1968).

The transfer of the Sharpe Agency expiration lists was separate and distinct from any transfer of goodwill as that term is normally used in the law. Neither Robins nor Mrs. Garlow thought it necessary to include in the contract for sale any amount for the transfer of goodwill, and the parties did not discuss the transfer of goodwill in their negotiations. These facts are not controlling on the issue of whether goodwill was a bargained-for item in the sale, but they do indicate that the parties did not regard goodwill as an element in the transaction sufficiently important to require negotiation. A careful review of the circumstances under which the expirations were sold by Mrs. Garlow to Robins leads to the conclusion based on the greater weight of the evidence that no substantial amount of goodwill was, in fact, transferred.

Mrs. Garlow operated a one personality business. She had established a clientele over the years on her own individual ability and initiative. She was the key and, in fact, the only individual in the Sharpe Agency. In the purchase of the Sharpe Agency, Robins did not retain Mrs. Garlow as an employee. Robins did not continue to use the "Terry D. Sharpe Agency" trade name nor did it retain the business location of the Sharpe Agency. Testimony at the trial revealed Robins did not desire to retain any of these normal characteristics of goodwill from the Sharpe Agency purchase because the "Robins & Weill Insurance Agency" trade name was a well-known and successful business symbol and was not new to the Greensboro geographical area. Robins clearly felt its own prestige and good name would outweigh the benefits derived from trading on Mrs. Garlow's goodwill.

In view of these facts it must be concluded that the sale of the Sharpe Agency did not include the expectancy by Robins that old customers will resort to the old place. Rather, the purchase of the Sharpe Agency was an attempt by Robins to expand its operations by acquiring expiration lists which would enable Robins' employees to contact potential customers at the most propitious time in order to sell them property and casualty insurance.

The situation regarding the transfer of goodwill to Robins in the Wood Agency is quite different from the factual setting in the Sharpe Agency purchase. The parties, in the negotiations for the purchase of the Wood Agency, frequently discussed the transfer of goodwill. This element of the proposed transaction was a pivotal factor in Robins' decision to purchase the Wood Agency. The parties reflected this consideration by including transfer of goodwill and trade name in the contract for sale and assigning it a value of ten dollars.

The purchase of the Wood Agency depended largely on the ability of Robins to retain the services of Jim King who had been the principal employee of the Wood Agency prior to the sale. (See Finding of Fact 26). Robins was entering a new geographical area in acquiring the Wood Agency and the Robins trade name was not well known in Asheboro. Robins' executives sought King's services to maintain customer contact and security during the transition after the sale. King agreed to employment by Robins and was appointed the manager of the Asheboro office. Robins also employed the additional office personnel who had been in the employ of the Wood Agency before the sale.

Moreover, Robins attempted to trade on the goodwill of the Wood Agency by maintaining the agency's trade name, office location, office signs, stationery, telephone, and advertisements. (See Findings of Fact 24 and 25). Every effort was made to utilize the Wood Agency goodwill after its purchase by Robins.

In the context of a sale price of $61,634.10 paid by Robins for the Wood Agency, the government has clearly established, in the light of basic economic realities, the transfer of goodwill exceeded the sum of ten dollars assigned by the parties. The value of goodwill consisted of Mr. Wood's reputation, the customer structure of the agency, the employee structure, the known location, and the standardized routine of doing business.

While a taxpayer may not freely avoid the consequences of his agreement as to allocation of value to items in a contract of sale, the Commissioner has to deal with the apparent agreement with which he is faced. Therefore, it is not unfair for the Commissioner to be less strictly bound to the bona fides of the agreement than are the parties themselves. See Harvey Radio Laboratories, Inc. v. Commissioner of Internal Revenue, 470 F.2d 118 (1st Cir. 1972). The government has offered sufficient evidence upon which the Court concludes the value of the goodwill transferred in the Wood Agency purchase exceeded ten dollars, and the taxpayer Robins has failed to meet his burden of showing what value Robins actually paid for goodwill and trade name.

██ Recalling the first criteria which the taxpayer must meet to depreciate expiration lists—that the expirations have an ascertainable value separate and distinct from goodwill—the taxpayer in this case has failed to sustain his burden of separating the amount paid for expirations in the Wood Agency purchase from the amount paid for goodwill. As far as the Wood Agency expirations are concerned, the Court could only arbitrarily guess at the actual values paid by Robins for goodwill and for the expiration lists. Having no basis on which to separate with reasonable certainty the amounts paid for the expirations, goodwill, and the covenant not to compete in the Wood Agency purchase, the Court must deny the taxpayer's claim for a refund of amounts disallowed by the Internal Revenue Service for depreciation of the Wood Agency expirations over the years in question.

## III. Value of Covenants Not to Compete and Expiration Lists

██ In order for an intangible asset (such as expiration lists or a covenant not to compete) to be depreciable, the asset must have a limited useful life and have an ascertainable value separate and distinct from goodwill. Houston Chronicle Publishing Co. v. United States, supra.

When Robins purchased the Sharpe Agency and, later, the Wood Agency, a lump sum was paid for the expirations and covenant not to compete in each transaction. There was no discussion of allocation of the sum paid Mrs. Garlow for the Sharpe Agency between the expirations and the covenant not to compete given by Mrs. Garlow. (See Finding of Fact 8). In the Wood Agency transaction, the parties did not intend at the time of contracting to allocate the amount paid for "Commissions to Become Due" between the cost of the expi-

ration lists and the covenant not to compete given by Mr. Wood. (See Finding of Fact 21). The facts in this case negate the existence of any intention by the parties in either the Sharpe or Wood sale to allocate the purchase price among the covenant and expirations at the time they executed their respective formal sales agreements.

In General Insurance Agency, Inc. v. Commissioner of Internal Revenue, 401 F.2d 324 (4th Cir. 1968), the Fourth Circuit set forth a test to be applied when a deduction is being claimed for insurance expirations and a covenant not to compete after a lump sum has been paid for both items in the sale contract. The court, after reviewing facts somewhat similar to the facts of this case, stated the determination is basically one of fact, involving the ascertainment of the parties' intentions and motivations, with the taxpayer having the burden of proof. The court further stated:

> The test or legal standard which we elect to apply in resolving this issue is what has been called the "economic reality" test. . . . whether a part of the purchase price represents payment for a non capital item, i. e., a covenant not to compete, depends upon whether the parties to the agreement intended to allocate a portion of the purchase price to such covenant at the time they executed their formal sales agreement. It is necessary also to establish that the covenant "have some independent basis, in fact, or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." Schulz v. C. I. R., 294 F. 2d 52, 55 (9 Cir. 1971).

General Insurance Agency, Inc. v. Commissioner of Internal Revenue, supra, 401 F.2d at 329–330.

Robins advances a theory that the cost of the expirations can be determined in both the Sharpe and Wood transactions by applying percentages recognized in the insurance industry as standard payment to salesmen for the acquisition of

new business. These percentages range from fifty percent to one hundred percent of the first year's revenues from premium payments. The plaintiff makes the argument that cost of the acquired expiration lists is equal to the percentage of the first year's premiums that would normally be paid an insurance salesman. Once the cost of the expiration lists is established, simple subtraction of the amount paid for the expirations from the lump sum will yield the cost of the respective covenants not to compete. Therefore, both items would have ascertainable values.

The problem with this argument is that it ignores the language of General Insurance Agency, Inc., supra, which requires that the parties to the agreement intend to allocate a portion of the purchase price to such covenant or expiration at the time they execute their formal sales agreement. Such a reconstruction of what the cost of expirations would be if secured by independent salesmen is irrelevant in determining what the parties' actual intentions were at the time of contracting for the sale and purchase of expirations. Furthermore, it is clear that neither Robins, Wood, nor Garlow intended to allocate a portion of the purchase price to the covenant at the time the agreement was entered into. (See Findings of Fact 8 and 21).

In Moscowitz v. United States, 314 F. Supp. 926 (E.D.Mo.1970), a taxpayer's suit was filed against the United States for recovery of alleged overpayment of federal income taxes. The plaintiffs sold their linen supply business and laundry to another company for a lump sum to be paid over a seven-year period. The agreement also provided for a covenant on the part of the plaintiffs not to compete with the purchasing company within a certain area for ten years. The contract did not allocate any specific amount of the purchase price to the covenant not to compete.

The question presented by the case on motion for summary judgment was whether a lump sum purchase price can

be judicially allocated to a covenant not to compete where the contract itself makes no such allocation, and where the parties to the contract did not agree with respect to their intention to allocate the purchase price. The court found a question of fact existed and denied the motion for summary judgment, stating the form of the contract alone could not be relied upon to establish that *some* allocation had been made by the parties to the covenant not to compete. Rather it was necessary to consider the circumstances with respect to the amount paid, if any, for the covenant which preceded the execution of the contract. The court rejected judicial determination of the allocation with reference to the parties' intentions for any period after the execution of the contract. The specific question to be determined at trial on the merits was whether the parties intended at the time of contracting to make an allocation, albeit unspecified, to the covenant.

Applying the rule of intention of the parties to the Sharpe and Wood transactions, Robins has failed to present any evidence to show that the parties, preceding the execution of the contracts, intended to allocate the purchase price between the expirations and the covenants not to compete. Robins cannot supplant the need for this evidence by advancing a theory for arriving at a cost figure for expiration lists which was not within the contemplation of the parties before contracting. Such a rule would allow a party to judicially redesign a contract based on a handy theory which met his present desires but had no reference as to the actual intention of the parties at the time they entered the bargain. The Court declines to adopt such a rule.[2]

In Leslie S. Ray Insurance Agency v. United States, 463 F.2d 210 (1st Cir. 1972), the taxpayer conducted a general insurance agency business and purchased two other agencies in order to expand. The purchase price was paid in a lump sum to each agency for all assets including covenants against competition. As in the present case, the documents of purchase assigned no specific monetary consideration for the agreements against competition. In its returns, the taxpayer allocated a substantial part of the purchase price to the agreements not to compete and claimed deductions which were disallowed by the Commissioner.

The court in *Ray* affirmed the Commissioner's position and refused to allow depreciation for the covenants not to compete. The court pointed out that at the time of the sales, allocation was never mentioned, let alone agreed to by the parties. Furthermore, the taxpayer conceded that he did not have apportionment in mind at the time the sales agreements were negotiated and executed. The court concluded that the "[p]laintiff's seeming contention, although it speaks in its brief of the intention of the parties, that it may allocate without any agreement, by proving the fair and reasonable value of the covenant not to compete, finds no support in the cases. In this well-traveled area we do not propose to lay out a new path." Leslie S. Ray Insurance Agency v. United States, *supra*, at 212.

■ Allocation of a portion of the purchase price to the covenant not to compete was not contemplated before agreement was reached by the parties in the present case, as is conceded by one of the plaintiff's chief executive officers. The facts indicate a lump sum was paid for the expiration lists and the covenant not to compete in both the Sharpe and Wood purchases. Therefore, since the parties did not intend to allocate the purchase price at the time of contracting, the Court will not do it for

2. Additional problems would also arise. Mrs. Garlow reported her gain from the sale of the Terry D. Sharpe Agency as a gain on the sale of property. She did not report any part of the gain as ordinary income. Mr. Wood reported his gain on the sale of Wood Insurance Agency as a capital gain with the exception of the amount received for books and supplies and with certain adjustments. In particular, he reported "Commissions to become due" as the sale of goodwill.

**1218**

them. Since it is not possible to ascertain the amount paid for expirations separate from the amount paid for the covenant not to compete in either the Sharpe or the Wood transactions, the plaintiff fails in his claims for a refund.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction of the subject matter of this action and over the parties pursuant to 28 U.S.C. § 1346(a)(1).

2. The insurance accounts or expirations purchased by Robins from the Sharpe and Wood Agencies have a limited useful life of seventeen and one-half years and twenty years, respectively.

3. No significant transfer of goodwill accompanied the purchase of the Sharpe Agency by Robins.

4. The transfer of goodwill in the Wood Agency purchase by Robins was substantially greater than the ten dollars which the parties allocated for that purpose.

5. The cost to Robins of the covenant not to compete is not separable from the cost of the expirations in either the Sharpe or Wood transactions since the parties did not intend to allocate a portion of the purchase price to such covenants at the time they executed their formal sales agreements. Inasmuch as the covenant and expirations acquired in both transactions have separate and distinct limited useful lives, it is not possible to calculate a schedule of depreciation.

6. The plaintiff, Robins & Weill, Inc., is not entitled to depreciate either the expirations or the covenants not to compete obtained in the purchase of the Terry D. Sharpe Agency and the Wood Insurance Agency. The tax deficiencies assessed and collected as a result of disallowance of the claimed deductions for such depreciation were correct. Plaintiff is entitled to no refund of taxes in this proceeding.

A judgment will be entered accordingly.