CHARLES W. AND SUSAN C. DECKER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Decker v. Commissioner
Docket Nos. 5229-84; 5230-84; 5231-84.
United States Tax Court
T.C. Memo 1987-388; 1987 Tax Ct. Memo LEXIS 385; 54 T.C.M. (CCH) 73; T.C.M. (RIA) 87388; August 10, 1987. Patrick B. Mathis, for the petitioners. Michael W. Bitner, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies in petitioners' Federal income tax as follows: Petitioners
1979
1980
Charles W. and Susan C. Decker
$ 6,845.25
$ 8,339.81
Robert B. and Sally A. Tedrick
-
1,762.00
Darrell E. and Velma J. Lauderdale
5,357.00
2,765.00
After concessions, [2] the issue for our determination is whether certain insurance expirations acquired *386 by a partnership are subject to an allowance for depreciation. [3]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts and attached exhibits are incorporated herein by this reference. All petitioners were residents of the State of Illinois at the time their respective petitions in the above cases were filed. In June of 1975, petitioner Darrell E. Lauderdale ("Lauderdale") and petitioner Charles W. Decker ("Decker") formed a corporation known as Lauderdale Insurance Agency, Ltd. ("Lauderdale Insurance Agency"). From its inception, Lauderdale Insurance Agency operated an insurance agency in Carbondale, Illinois, dealing principally in the sale of business and commercial lines of property and casualty insurance. Lauderdale has been *387 involved in the sale of insurance since 1959. Decker was a lawyer in general practice until January of 1980 when he joined the Lauderdale Insurance Agency. Wm. J. Cunningham, Inc. ("WJC") was a corporation engaged in the operation of an insurance agency in Pinckneyville, Illinois, during the period 1974 through August 31, 1978. Pinckneyville is approximately 35 miles from Carbondale, Illinois. WJC was involved principally in the sale of business and commercial lines of property and casualty insurance, as well as the sale of life insurance. The sole shareholder of WJC was William J. Cunningham, IV ("Cunningham"), who was also its principal salesman and employee. Prior to his employment with WJC, Cunningham was employed by The Cunningham Agency, Inc., which operated a general insurance agency. Cunningham's father, William J. Cunningham, III, was the principal shareholder of The Cunningham Agency, Inc. ("The Cunningham Agency"). In December of 1974, WJC paid the purchase price of $ 100,000.00 to acquire that portion of The Cunningham Agency which operated as a general insurance agency. Included in the purchase agreement was a covenant not to compete whereby The Cunningham *388 Agency and William J. Cunningham, III, agreed not to compete with WJC in the insurance business within 25 miles of Pinckneyville, Illinois, for a period of five years. WJC also agreed to a five-year lease of the offices formerly occupied by The Cunningham Agency. In March of 1976, WJC purchased from Egyptian Insurance & Realty Agency Inc. ("Egyptian"), a certain portion of such entity which constituted a general insurance agency for the purchase price of $ 75,000.00. The principal shareholder of Egyptian was Cunningham's mother, who operated this insurance agency after her divorce from William J. Cunningham, III. Egyptian was also located in Pinckneyville, Illinois. Included in the purchase agreement was a covenant not to compete whereby Egyptian and its officers agreed not to compete with WJC in the insurance business within 25 miles of Pinckneyville, Illinois, for a period of five years. In August of 1978, Lauderdale and Decker entered into a partnership agreement for the purpose of operating an insurance brokerage business under the name of Comprehensive Insurance Services ("Comprehensive"). Roger B. Tedrick ("Tedrick") joined Comprehensive as a partner during 1980. In *389 1978, Comprehensive entered into negotiations with Cunningham for the purchase of the insurance expirations of WJC. Within the insurance industry, a list which contains the name of an insured, the amount and nature of insurance coverage, the location of risk, the insurance policy expiration date, and other relevant data is typically referred to as an "insurance expiration." The Lauderdale Insurance Agency desired to expand its market coverage to include Pinckneyville. Lauderdale and Decker organized Comprehensive to acquire the commercial property and casualty insurance policies of WJC as a means to achieve market penetration in Pinckneyville. Lauderdale and Decker sought additional volume for Lauderdale Insurance Agency in order to improve its position with the companies through whom it wrote coverage. Comprehensive did not desire to purchase the life or health insurance policies of WJC. Pursuant to a brokerage agreement between Lauderdale Insurance Agency and Comprehensive, insurance policies written by Comprehensive were to be brokered through Lauderdale Insurance Agency. Lauderdale and Decker considered Pinckneyville to be an attractive commercial market and that the commercial *390 insurance expirations of WJC provided immediate access to the commercial insurance market. Only one other agency was operating in Pinckeyville at that time. Consequently, Lauderdale and Decker determined to acquire the desired expirations of WJC rather than develop an independent commercial property and casualty insurance agency in Pinckneyville. On August 30, 1978, Comprehensive and WJC and Cunningham executed a Purchase Agreement ("the Comprehensive Purchase Agreement") whereby Comprehensive acquired all insurance accounts, lists, renewals, and insurance records and papers of WJC. Comprehensive did not acquire any right to income from life insurance policies of WJC with an effective date on or before August 31, 1978. Comprehensive did not acquire any accounts receivable dut to WJC or assume any debts or any liability of WJC which relate to the insurance business of WJC. Comprehensive acquired all commission income due WJC on or after September 1, 1978, including all audit income received after such date, and assumed liability for all expenses related to acquired policies with an effective date on or after September 1, 1978. WJC retained the right to all commission income *391 due WJC and to pay all expenses, including refunds of unearned premiums, audit liability and other liabilities to companies for any and all policies having an effective date, anniversary date, or renewal date on or before August 31, 1978. Comprehensive agreed to pay WJC all premiums, commissions, or other income received by Comprehensive concerning such policies and was entitled to reimbursement for any expense incurred concerning such policies. By an Assignment of Lease dated August 30, 1978, Cunningham and WJC assigned to Lauderdale Insurance Agency their entire lease interest as lessee of the office facilities of WJC at 4 East Water Street, Pinckneyville, Illinois. These premises were utilized by the Lauderdale Insurance Agency until October 1984. The Comprehensive Purchase Agreement assigned to Comprehensive the rights and privileges of WJC acquired pursuant to the acquisition of The Cunningham Agency by WJC in December of 1974. Such assignment expressly includes the right of Comprehensive to enforce the covenant not to compete acquired by WJC from The Cunningham Agency. The Comprehensive Purchase Agreement also assigned to Comprehensive the rights and privileges by WJC *392 acquired pursuant to the acquisition of Egyptian by WJC in March of 1976. Such assignment expressly includes the right of Comprehensive to enforce the covenant not to compete acquired by WJC from Egyptian. The Comprehensive Purchase Agreement provides that WJC and all officers of WJC shall not engage, except on behalf of Comprehensive, in the insurance business, either directlyy or indirectly, within 25 miles of Pinckneyville, Illinois, for a period of five years. The Comprehensive Purchase Agreement also provided such covenant not to compete as to Cunningham. The Comprehensive Purchase Agreement specifically set forth that Comprehensive shall not be entitled to the right to use the name of WJC. However, pursuant to such agreement Cunningham and WJC agreed to aid and assist, as requested or required by Comprehensive, to secure the renewal or transfer of WJC's agency contracts with any and all insurance companies for which WJC had acted as agent. Pursuant to the Comprehensive Purchase Agreement, Comprehensive agreed to acquire WJC for $ 324,300.00 specifically allocated as follows: $ 5,000.00
-
WJC covenant not to compete
5,000.00
-
Cunningham covenant not to compete
10,416.64
-
The Cunningham Agency covenant not to compete
16,666.64
-
Egyptian covenant not to compete
287,216.72
-
Insurance expirations acquired from WJC
$ 324,300.00
Total Purchase Price
*393 The Comprehensive Purchase Agreement made no provision whatsoever for any amount to be allocated to goodwill. Lauderdale and Decker had determined that a fair market purchase price should employ a multiple of 2.8 times the gross commissions of WJC during the period of September 1, 1977, through August 31, 1978. WJC represented that it earned $ 115,821.00 during such period. During August of 1979, Comprehensive and Cunningham entered into a Modification Agreement whereby the purchase price of the Comprehensive Purchase Agreement was reduced to $ 295,123,64. Such reduction was negotiated due to the conclusion of Comprehensive that the gross commission income amount used to calculate the purchase price was not truly reflective of the commission income earned by WJC. In the year 1978, Comprehensive claimed a depreciable basis of the acquired insurance expirations in the amount of $ 287,216.00 as originally allocated pursuant to the Comprehensive Purchase Agreement. Comprehensive claimed a depreciable basis in the amount of $ 258,040.00 for each of the taxable years 1979 and 1980. Comprehensive utilized the straight-line method of depreciation and a seven-year useful life. *394 Incident to the Comprehensive Purchase Agreement, Comprehensive and Cunningham entered into an Employment Agreement dated August 30, 1978. The Employment Contract provided that Comprehensive employ Cunningham as an insurance agent and broker for a three-year period. Cunningham was to receive the respective amounts of $ 25,000,00, $ 27,500,00 and $ 30,000.00 for each twelve-month period during the succeeding three years. Comprehensive retained the absolute right to review the salary provisions of the Employment Agreement. The Employment Agreement was terminated on August 10, 1979. By Agreement dated August 10, 1979, Cunningham and Lauderdale Insurance Agency entered into an Independent Contractor Agreement whereby Cunningham agreed to broker insurance accounts through Lauderdale Insurance Agency. Lauderdale Insurance Agency agreed to pay Cunningham a 50-percent commission on first year net commissions and a 30-percent commission on all net commissions income on renewal policies provided such account renewals were not for insurance accounts of Lauderdale Insurance Agency or Comprehensive. The Agreement term was unrestricted and terminable by either party upon 30 days' notice. *395 The Lauderdale Insurance Agency terminated Cunningham as an independent contractor in January of 1980. During this period Cunningham would accompany either Lauderdale or Decker to meet with the policyholders of commercial accounts to negotiate the renewal of any expirations. When individual accounts came up for renewal, a notice of renewal was sent to the policyholder indicating the purchase of WJC by Comprehensive. Comprehensive initially commenced business in Pinckneyville under the name of Lauderdale Insurance Agency, Ltd. During the year 1980 Comprehensive commenced doing business as Lauderdale & Decker Insurance Agency, Ltd. ("Lauderdale and Decker Insurance") in Pinckneyville. The telephone directory listed "Cunningham Insurance" with the reference "see Lauderdale Insurance Agency, Ltd." Lauderdale and Decker Insurance was advertised in the yellow page telephone directory with the parenthetic reference one year. According to Decker, he was not aware of the reference. In any event, Decker believe that the name recognition of Lauderdale and Decker was superior to that of Cunningham. The telephone directory reference comprised the only advertising conducted by Comprehensive *396 for Lauderdale and Decker Insurance. The acquired WJC computer recordkeeping system was abandoned as the recordkeeping was consolidated with Lauderdale Insurance Agency in Carbondale. Prior to the acquisition by Comprehensive, WJC employed six sales people, including Cunningham, and two clerical employees. Subsequent to Comprehensive's acquisition, Comprehensive retained Cunningham and the two clerical employees. In acquiring the insurance accounts, lists, renewals and expirations of WJC pursuant to the Comprehensive Purchase Agreement, Comprehensive acquired 1,564 property and casualty policies of insurance. These policies represented 1,107 accounts which had established a business relationship with WJC. [4]
During the period from September 1978 through August 1983, the following number of those insurance policies which were acquired by Comprehensiv from WJC were terminated: Period
Policies
September 1978 through August 1979
121
September 1979 through August 1980
210
September 1980 through August 1981
142
September 1981 through August 1982
110
September 1982 through August 1983
93
676
*397 During the period from September 1978 through December 1983, 503 of the 1,107 accounts which Comprehensive acquired from WJC were terminated. During the period from September 1978 through the year 1984. Comprehensive wrote the following number of insurance policies on those accounts which it acquired from WJC: Period
Policies
September 1978 through December 1978
1
1979
8
1980
25
1981
47
1982
66
1983
35
1984
58
240
During the period from September 1978 through the year 1984, Comprehensive acquired the following number of new insurance accounts, and wrote the following number of insurance policies on such accounts, in the operation of its Pinckneyville, Illinois, insurance agency: Period
Accounts
Policies
September 1978 through
December 1978
9
11
1979
20
26
1980
35
59
1981
48
89
1982
40
54
1983
43
69
1984
23
31
218
339
The record does not indicate the degree to which new accounts or policies were attributable to referrals from patrons *398 of WJC or the efforts of Cunningham pursuant to the Employment Contract or Independent Contractor Agreement. William K. Lee ("Lee") is a principal of the Middleton Group ("Middleton"), a management consulting firm providing a variety of services to organizations within the insurance and financial services industries. One designated service of Middleton is to provide quantitative approaches to determine the valuation and useful life expectation of acquired insurance expirations. Lee earned the Chartered Property and Casualty Underwriter designation in the year 1978 and has relevant experience as a management consultant within the insurance industry. Lee was qualified to issue expert opinion concerning the valuation and useful life expectancy of the acquired WJC expirations. An expert report authored by Lee has been incorporated with the record. Lee stated that the useful life expectancy of acquired insurance expirations will vary based upon any unique circumstances attendant to the transaction and the demographics of the client base. Age and transience of the policyholders are demographic factors which influence useful life expectancy. Lee's report did not provide the source *399 of the industry surveys relied upon for his determinations or include other indicia of corroboration necessary to support the conclusions therein. Lee omitted relevant demographic information. Lee concluded that Comprehensive's determination of a seven-year useful life expectancy for the acquired insurance expirations was reasonably accurate and consistent with the industry average as of August 31, 1978. According to Lee, various industry surveys of insurance agency operations reveal that each year an average of 10 percent of an agency's original customers are lost. However, when an insurance agency is acquired, such average increases to 20 percent for some period following the sale and that eventually the rate of customer base attrition should return to an annual average of 10 percent. Lee concluded that the insurance expirations of an average agency should expect a ten-year useful life where no change of ownership occurs and that the insurance expirations of an average agency should expect a minimum five-year useful life if a change of ownership occurs. Consequently, Lee determined that the useful life expectancy of the acquired WJC insurance expirations should with reasonable *400 accuracy be seven or eight years. Lee utilized three different methods of valuing the expirations. First, Lee employed the "income approach." The "income approach" is the present value of the pre-tax profits generated by the expirations over their estimated useful life. To determine pre-tax profits, projected expense ratios are calculated based on the financial history of WJC and compared to a composite of privately held agencies with net revenues of less than $ 750,000.00. The objective of the "income approach" is to estimate the pre-tax profit generated solely by the acquired insurance expirations. Lee employed a seven-year useful life expectancy and an eight-year useful life expectancy. Second, Lee employed the "cost approach" which estimates the total cost that would be incurred to develop over time the equivalent number of customers serviced by the agency selling the expirations, based upon the costs and experience of the buyer in writing new business. Finally, Lee utilized the "cost build-up approach" which is the present value of estimated costs that would be incurred over time to establish a new agency with a customer base similar to that serviced by the agency selling *401 the expirations. It assumes moving into an area ideal for the average agency. Lee stated that greater reliance is to be placed on the income approach, a method more commonly used by consultants. The income approach allows an evaluation of the expirations solely by eliminating other considerations that might be present if an entire insurance agency operation were being acquired. The cost approach and cost build-up approach are used to verify the results of the income approach. Lee concluded the valuation of the acquired insurance expirations as of August 31, 1978, as follows: Income Approach
7-Year Life
$ 253,518
Income Approach
8-Year Life
278,686
Cost Approach
234,084
Cost Build-Up Approach
252,073
Lee concluded that there is little, if any, goodwill or going-concern value in the transaction. This conclusion was based on the assumptions that Comprehensive only purchased specific assets not comprising a going business, the name of Cunningham or WJC were not subsequently used in the business, those employees with client contact were terminated upon acquisition, clerical employees of WJC had little client contact, and the office location *402 was no better than other space then available. According to Lee, any goodwill or going-concern value would be represented by the excess of the purchase price over the calculated value of the expirations. OPINION We must determine whether Comprehensive is entitled to amortize [5] the insurance expirations acquired from WJC. Respondent contends that the acquired insurance expirations are not amortizable because such intangible asset is inextricably linked with the goodwill of WJC so as to not be capable of a separate and ascertainable useful life with reasonable accuracy. Petitioners assert that the acquired insurance expirations constitute an intangible asset separate and distinguishable from any goodwill attributable to WJC ascertainable with reasonable accuracy to expect a limited useful life of seven years. Section 167(a)[6] allows as a depreciation deduction a reasonable allowance *403 for exhaustion, wear and tear (1) of property used in the trade or business, or (2) of property held for the production of income. Section 1.167(a)-3, Income Tax Regs., provides, in pertinent part, as follows: Sec. 1.167(a)-3. Intangibles. If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has limited useful life. No deduction for *404 depreciation is allowable with respect to goodwill. * * *
A taxpayer may establish the useful life of an asset for depreciation based upon his own experience with similar property, or if his own experience is inadequate, based upon the general experience in the industry. Sec. 1.167(a)-1(b), Income Tax Regs.
Petitioners assert an established value for the acquired insurance expirations separate from goodwill and any other nonamortizable intangible asset and assert that such expirations embody a limited useful life which may be determined with reasonable accuracy. Consequently, petitioners maintain that the requirements necessary to an entitlement to depreciate an intangible asset are satisfied. Goodwill represents the expectancy that "old customers will report to the old place" of business. Houston Chronicle Publishing Co. v. United States,481 F.2d 1240, 1247 (5th Cir. 1973); see also VGS Corp. v. Commissioner,68 T.C. 563, 590 (1977). *405 The essence of the concept of goodwill is a pre-existing business relationship founded upon a continuous course of dealing that can be expected to continue indefinitely. Computing & Software, Inc. v. Commissioner,64 T.C. 223 (1975). The Supreme Court long ago defined goodwill as follows:
the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessity, or even from ancient partialities or prejudices. * * * [Metropolitan Bank v. St. Louis Dispatch Co.,149 U.S. 436, 446 (1893).]
Goodwill exists where there is an "expectancy of both continuing excess earning capacity and also of competitive advantage or continued patronage." Wilmot Fleming Engineering Co. v. Commissioner,65 T.C. 847, 861 (1976). *406 Going-concern value, as distinguished from goodwill, constitutes "the additional element of value which attaches to property by reason of its existence as an integral part of a going concern." VGS Corp. v. Commissioner,68 T.C. at 591. It is characterized by the ability of an acquired business to continue to operate and generate income without interruption during and after acquisition. Solitron Devices, Inc. v. Commissioner,80 T.C. 1, 19-20 (1983); affd. without published opinion 744 F.2d 95 (11th Cir. 1984); VGS Corp. v. Commissioner,68 T.C. at 592. Goodwill and going-concern value are separate and distinct intangible assets, not mutually dependent on each other for their existence. Concord Control, Inc. v. Commissioner,615 F.2d 1153, 1155 (6th Cir. 1980), affg. on this issue a Memorandum Opinion of this Court. Both the goodwill and going-concern value of a business constitute nonamortizable intangible assets. See Computing & Software, Inc. v. Commissioner, supra.
Insurance expirations consist of an agency's records of insurance policies containing information such as the *407 name of the insured, the amount and nature of coverage, the premium, the location of the risk, the policy expiration date, and other pertinent data. Marsh & McLennan, Inc. v. Commissioner,51 T.C. 56, 58 (1968), affd. 420 F.2d 667 (3d Cir. 1969). This information aids the insurance agent in obtaining renewals of policies and gives the agent an advantage over his competitors by providing him an entree that would not otherwise be available. Marsh & McLennan, Inc. v. Commissioner, supra.The intangible insurance expirations are not, as a matter of law, an asset not subject to depreciation. Houston Chronicle Publishing Co. v. United States,481 F.2d at 1249-1250; Tomlinson v. Commissioner,58 T.C. 570, 580 (1972), affd. 507 F.2d 723 (9th Cir. 1974). We have previously determined in numerous cases that insurance expirations were not assets subject to an allowance for depreciation based on our factual determination that such insurance expirations were part of a going concern so inextricably linked to goodwill *408 that no separate ascertainable intangible asset existed and that a limited useful life could not be determined with reasonable accuracy. Tomlinson v. Commissioner,58 T.C. at 581-582; Marsh & McLennan, Inc. v. Commissioner,420 F.2d 667 (3d Cir. 1969), affg. 51 T.C. 56 (1968); Thoms v. Commissioner,50 T.C. 247 (1968). [7]
Our inquiry is essentially factual. Where the record does not afford a factual basis for a precise determination that a certain amount be allocated to an amortizable intangible asset, we may consider whether the record provides sufficient evidence to permit a reasonable allocation to an amortizable intangible asset. Manhattan Co. of Virginia, Inc. v. Commissioner,50 T.C. 78, 92 (1968)
Petitioners bear the burden of establishing the reasonableness of any amortizable basis as respondent's determinations are presumptively correct. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a); sec. 1.167(b)-O, *409 Income Tax Regs. Petitioners must establish that the acquired insurance expirations at issue (1) have an ascertainable value separate and distinct from goodwill or other intangible assets, and (2), that such expirations embody a limited useful life, the duration of which is ascertainable with reasonable accuracy. Houston Chronicle Publishing Co. v. United States, supra.
Based on our examination of the entire record, we find that petitioners purchased a viable going-concern and that the expirations are so inextricably linked to goodwill that a limited useful life determination cannot be ascertained with reasonable accuracy. We note that petitioners retained the same office building, the same clerical staff, the principal salesman, the seller's phone number, and by the transaction acquired a large percentage of the Pinckneyville commercial insurance market. Petitioners testified that they had no physical location in this market prior to the acquisition and stated that the purchase was in lieu of establishing an active and profitable agency there. Petitioners point to facts that they did not acquire and life and health insurance portion of WJC and that their only *410 interest was in commercial lines as evidence that a going-concern was not acquired. We find little merit to these points. Both the life and health insurance and the personal lines were but a small portion of the agency's business. Elimination of either or both of these would not have jeopardized the agency's ability to continue generating sales without interruption during and after the acquisition. Additionally, the lack of desire to acquire the personal lines does not change the fact they were acquired. Marsh & McLennan, Inc. v. Commissioner, supra.
We find particularly fatal to petitioners' assertions the fact that Cunningham was provided an employment contact and continued to solicit business on behalf of Comprehensive. Furthermore, the Comprehensive Purchase Agreement specifically provided that Cunningham and WJC would aid and assist, as requested or required by Comprehensive to secure the renewal or transfer to WJC's agency contracts with any and all insurance companies for which WJC acted as agent. We are certain that petitioners desired to acquire a going-concern and attendant goodwill; yet, petitioners allocated no portion of the purchase price to goodwill or other *411 nonamortizable asset. This singular fact, in the context of the relevant facts and circumstances before us, arouses some concern as to the reasonableness of petitioners' filing position at the time the respective income tax returns were filed. The facts demonstrate a one-sided view which flies in the face of commercial reality. Simply put, petitioners desired to use Cunningham in efforts to renew policies and maintain accounts of WJC while simultaneously attempting to create an appearance that the insurance expirations were the singular asset acquired from WJC. The inescapable conclusion is that petitioners' filing position which allocated no portion of the purchase price to a nonamortizable asset was aggressive and is illustrative of a sense of gamesmanship with the Internal Revenue Service. In this instance, petitioners' decision not to allocate any portion of the purchase price to goodwill was egregious. The evidence supports respondent's contention that petitioners acquired goodwill in the purchase. The subsequent employment and utilization of Cunningham are paramount. If the "Cunningham" name possessed no element of goodwill as petitioners contend, then it escapes our *412 understanding as to why they would employ Cunningham at an initial annual salary of $ 25,000 to make introductions to commercial clients making up the majority of the agency. Such trading on the name or reputation of the seller is usually construed as an attempt to capitalize on the goodwill of the seller. [8]
*413 Assuming arguendo that the record provided sufficient evidence for our determination that a portion, or perhaps even the entire purchase price, was allocable to the acquired insurance expirations so as not to be inextricably linked to goodwill, [9] we would nevertheless be compelled to find that any such value was paid to acquire an asset, the useful life of which is incapable of determination with reasonable accuracy. See Roy H. Park Broadcasting v. Commissioner,78 T.C. 1093, 1123 (1982). *414 We are not bound by expert opinions where such opinion is contrary to our own judgment. United States v. Pittman,449 F. 2d 623 (7th Cir. 1971). We must weigh such evidence in light of the demonstrated qualifications of the expert and all other evidence. Anderson v. Commissioner,250 F.2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. We may embrace or reject expert testimony, whichever, in our best judgment is appropriate. Helvering v. National Grocery Co.,304 U.S. 282 (1938). Petitioners maintain that the limited useful life of the acquired expirations to be seven years. Petitioners' expert Lee determined that the useful life of the acquired expirations was limited to seven or eight years with reasonable accuracy. We find this testimony to be unpersuasive. Petitioners and their expert did not take into account subsequent referrals from acquired accounts in their analysis. Accordingly, they ignored the addition to the life and value of the expirations generated by the referrals. [10] Petitioners stated that *415 the acquisition would provide them with more than just the income flow on the expirations and noted that the acquisition of WJC would provide an entree into a new market and create a new level of operations, [11] improving Lauderdale Insurance Agency's position with the companies through which it wrote coverage. We find that petitioners have not demonstrated that the useful life of the acquired expirations is limited to seven years. Based on this record, we are unable to ascertain a limited useful life of the expirations. *416 Lee, petitioners' expert, stated that the expirations of an "average" acquired agency would have a minimum useful life of five years. When questioned as to the definition of an "average" agency, Lee replied that it was one whose operations were predominantly comprised of personal lines. This definition would not apply to WJC as it was an agency dealing primarily in the commercial market. The expert also related that the average age of personal lines policyholders was a factor in determining the useful life, but no such consideration was taken into account in his estimate. Lee made reference to the demographics of the area referring to the economy as "transient and potentially volatile" as evidence justifying a limited life. No testimony was offered as to the effect of a transient population on an agency largely comprised of commercial accounts as opposed to personal lines of business, nor were the stated negatives of the economy reconciled with petitioners' contention that it was an "attractive commercial insurance market." Of paramount importance, evidence was offered that certain percentages of accounts and policies were lost over time to show that the expirations were of *417 a wasting nature. [12] No detail was offered as to the magnitude or relative importance of these lost accounts or whether such accounts were renewed at a later date. This information is important in assessing any diminution in value. Hodges v. Commissioner,50 T.C. 428, 444 (1968). During the five-year period commencing September of 1978, 676 policies acquired by Comprehensive were terminated. [13] We are unable based on this record to conclude that the acquired expirations make up a wasting asset with a reasonably determinable useful life. *418 The parties have cited a number of cases which we have read and considered. While some of them have facts in common with the issue before us, none involve facts substantially similar to those at hand. We therefore conclude that petitioners are not entitled to a deduction for amortization of expirations acquired from WJC. Decisions will be entered for the respondent.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Roger B. and Sally A. Tedrick, docket No. 5230-84; and Darrell E. And Velma J. Lauderdale, docket No. 5231-84. ↩
2. Petitioners Lauderdale have conceded the disallowance of certain claimed expenditures as employee business expenses. ↩
3. Susan C. Decker, Sally A. Tedrick, and Velma J. Lauderdale are parties to this action solely by virtue of filing joint Federal income tax returns. Unless otherwise specified, petitioner or petitioners shall refer to petitioner husbands. ↩
4. We assume that the term "policy" refers to an insurance contract to insure a specific risk and that the term "account" refers to a specific client which may or may not execute more than one policy. The record does not indicate otherwise. ↩
5. Sec. 167(a)↩ and the regulations maintain no clear distinction between the terms "amortization" and "depreciation," and accordingly no distinction is intended herein with regard to use of these terms. 6. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
7. Fletcher v. Commissioner,T.C. Memo. 1965-273↩. 8. Efforts to introduce the purchaser to clients or to help him retain customers have been a consideration in finding for the existence of goodwill. Proctor v. Commissioner,T.C. Memo. 1981-436; Flectcher v. Commissioner, supra; Robins & Weill, Inc. v. United States,382 F. Supp. 1207, 1214-15 (M.D. N.C. 1974). Contrast Vaaler Insurance, Inc. v. United States, an unreported case ( D. N.D. 1974, 21 AFTR2d 558, 68-1 USTC par. 9183), a case where a taxpayer was permitted a depreciation deduction for insurance expirations. In Vaaler the Court made specific findings, among others, that the seller's name was not subsequently used in any way and the seller did not accompany the purchaser in meeting with policyholders. In Savings Assurance Agency, Inc. v. Commissioner,T.C. Memo. 1963-52↩, another case finding no goodwill, the original acquaintanceship with each potential customer acquired was an accomplished fact prior to acquisition of the expirations. 9. Petitioners' expert Lee attempted to establish that the expirations at issue were of a fair market value on August 31, 1978, of an amount approximately equal to the amount so allocated by petitioners. We need not address the methods utilized or the reasonableness of the values ascertained. We have assumed that the expirations at issue were capable of an extricable valuation separate and distinct from goodwill solely for purposes of addressing the useful life aspect of the inquiry as to whether the insurance expirations are subject to amortization. See Roy H. Park Broadcasting v. Commissioner,78 T.C. 1093, 1124↩ n.32 (1982). We note however that the valuation methods are suspect as the industry surveys relied upon are not referenced and therefore cannot corroborate the findings of Lee. We are not persuaded but are instead asked to accept such opinion that WJC is illustrative and consistent with industry averages. We must determine that the relied-upon industry surveys are reliable and relevant to the evaluation of WJC, which we are unable to do from the report submitted. 10. Fletcher v. Commissioner,T.C. Memo. 1965-273, n.8.; Fullerton Co. v. United States,381 F. Supp. 1353, 1355-1356, (D. Or. 1974), affd. 550 F.2d 548 (9th Cir. 1977); Thoms v. Commissioner,50 T.C. 247, 255 (1968). Cf. Credit Bureau of Erie, Inc. v. Commissioner,54 T.C. 726, 731-32↩ (1970). 11. Fullerton Co. v. United States, supra↩ at 1356, in stating that the value of the accounts persisted indefinitely in the form of new business resulting from the position as the owner of the expirations, noted that the purchaser "gained a new level of operation and an opportunity to make inroads into markets already opened by [seller]." 12. Petitioners in Flectcher v. Commissioner, supra at n.8, also introduced statistical information showing the loss of 59.9 percent of the purchased expiration business after five years from the acquisition. The Court found this information, that 40.1 percent of the business was still retained, to be evidence that the useful life could not be reasonably ascertained. Here 63.2 percent of the policies were still active within five years of acquisition. Statistical evidence that indicated that some accounts would continue on for a long and indefinite period works against the contention that an expiration list has a limited life which can be estimated with reasonable accuracy. Marsh & McLennan v. Commissioner,51 T.C. 51, 65 (1968), affd. 420 F.2d 667↩ (3d Cir. 1969). 13. Comprehensive acquired 1,564 policies. Consequently after a period of five years approximately 43 percent of the acquired expirations were terminated. Such fact is inconsistent with petitioners assertion that the acquired expirations had a limited useful life of seven years. ↩