LOS ANGELES CENTRAL ANIMAL HOSPITAL, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 882–74. Filed May 25, 1977.

*Justin L. Goldner* and *Charles B. Baumer,* for the petitioner.
*Alan R. Herson,* for the respondent.

QUEALY, *Judge:* Respondent determined deficiencies in petitioner's Federal income tax in the amounts of $4,636.56 and $4,812.52 for the taxable years ending on May 31, 1971, and May 31, 1972.

The only issue for decision is whether petitioner is entitled to a deduction for the amortization of the cost of medical record cards acquired in the purchase of an animal hospital.

Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioner Los Angeles Central Animal Hospital, Inc., is a corporation organized on June 1, 1969, under the laws of the State of California. Petitioner's principal place of business is in Los Angeles, Calif. Petitioner filed timely Federal income tax returns for the fiscal years ending on May 31, 1971, and May 31, 1972, with the Western Service Center in Ogden, Utah.

Dr. A. Dean Aberman, a licensed veterinarian, owns all of the issued and outstanding stock of the petitioner. Petitioner operates a small animal or cat and dog hospital on West Avenue in Los Angeles, Calif. Before petitioner acquired this hospital, it was operated by Dr. Zaks' Pet Hospital, Inc., a corporation owned by Dr. Sherman Z. Zaks.

Dr. Aberman had been employed by Dr. Zaks' Hospital since April 1, 1968. At the time of his initial employment, he and Dr. Zaks had an understanding that Dr. Aberman would eventually have the opportunity to acquire all, or at least an interest in, the veterinarian practice.

After October 1968, when Dr. Zaks opened a second animal hospital, the Alhambra, which was located approximately 5 miles away, the negotiations for Dr. Aberman's purchase of the business apparently became more serious. The two doctors frequently discussed the purchase, at first on an informal basis and then later in conjunction with Dr. Zaks' lawyer and accountant. On May 30, 1969, after three or four formal negotiating sessions, the two parties, Dr. Aberman for the petitioner and Dr. Zaks for his corporation, entered into a written agreement for the purchase of the business assets of the hospital for $245,500. Together with the purchase agreement, the parties executed on the same date a security agreement and a lease. In the lease, it was agreed that Dr. Zaks and Frances Zaks would lease the hospital building to petitioner for a period of 10 years commencing June 1, 1969.

The purchase price included the acquisition of all assets used in the operation of the animal hospital. These included furnishings, equipment, and medical records. In addition, the agreement specified that goodwill was transferred including the right to use the name "Dr. Zaks' Dog and Cat Hospital" for a period of 2 years.

Prior to the purchase of the animal hospital, Dr. Aberman was not allowed to examine the books of account, but through his employment at the hospital he had the opportunity to inspect the equipment and the medical record cards containing the medical histories of the animals examined by the hospital and the amounts charged for such examinations.

The agreement provided that the purchase price would be allocated to the respective assets as follows:

| | |
|---|---|
| (a) Furniture, furnishings, fixtures, and equipment | $25,000 |
| (b) Goodwill | 50,000 |
| (c) Agreement not to compete | 50,000 |
| (d) Customer lists | 120,500 |
| Total | 245,500 |

These allocations were the result, in the most part, of the arm's-length negotiations of the parties. Dr. Zaks had taken the position during the negotiations that the entire purchase price should equal 1 year's gross income plus the cost of the inventory. The resulting amount was allocated among the items according to their relative worth to the parties.

Almost half of the purchase price, $120,500, was allocated to the "customer list" or medical record cards of the hospital. Both parties considered that this was the most important asset transferred. Although all of the medical record cards of the hospital dating back to 1952 and in some cases 1940 were transferred, the basis for the allocation of the purchase price was a group of approximately 12,000 medical record cards representing owners who had brought animals to the hospital within the 2-year period prior to May 30, 1969. Each medical record card contained the owner's name, address, telephone number, and the legal description and medical chart of the animal patient. The information on the card also included the animal's age and the fees charged the customer for each visit.

Both Dr. Aberman and Dr. Zaks agree that these cards are very important to the operation of petitioner's business. The

cards are kept at the receptionist's desk. When an owner brings in an animal for treatment, the patient's card is pulled and given to the doctor. The medical information on the card aids the doctor in the diagnosis and treatment of the animal patient. Although a veterinarian can treat a patient without the benefit of such medical record, its existence makes effective diagnosis and treatment easier and faster.

Additionally, a post card reminder system for booster innoculations for dog patients was maintained in conjunction with these files. When a dog was innoculated for distempter, hepatitis, and leptospirosis, a reminder card was filled out for the booster shots. Reminder cards were also filled out for rabies shots at an owner's request. Dogs represented approximately 70 percent of the animals examined.

The petitioner claimed a deduction in the amount of $24,100 on its Federal income tax returns in each of the fiscal years ending on May 31, 1971, and May 31, 1972, for the amortization of the cost of these records on the basis of a 5-year useful life.

Respondent, in his statutory notice of deficiency dated January 25, 1974, disallowed this deduction on the grounds that the value which petitioner attributed to the records was inseparable from the goodwill acquired in the purchase of the veterinarian busines.

OPINION

The principal asset acquired by petitioner in its acquisition of a small animal hospital was approximately 12,000 medical record cards for the animals examined by the hospital in the last 2 years. Petitioner amortized the amount allocated to the cards on the basis of a 5-year useful life.

Respondent contends that no deduction is allowable for depreciation of the medical record cards because the cards are an inseparable part of the goodwill or going-concern value of the business assets and, as such, are not depreciable since the petitioner has not established that the list has an ascertainable value separate and distinct from goodwill. *Manhattan Co. of Virginia, Inc. v. Commissioner,* 50 T.C. 78 (1968).

Section 167(a) provides that there shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, including obsolescence, of property used in a trade

or business. The term "property" includes intangibles, and the rules for the allowance of a depreciation deduction for intangibles are set forth in section 1.167(a)–3, Income Tax Regs:

Sec. 1.167(a)–3 Intangibles.

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. * * *

To qualify for a depreciation deduction with respect to the medical records, petitioner must show that these records (1) had an ascertainable cost basis separate and distinct from the goodwill and going-concern value of the purchased business, and (2) had a limited useful life, the duration of which could be ascertained with reasonable accuracy. *Ralph W. Fullerton Co. v. United States,* 550 F.2d 548 (9th Cir. 1977); *Houston Chronicle Publishing* Co. *v. United States,* 481 F.2d 1240 (5th Cir. 1973), cert. denied 414 U.S 1129 (1974); *Commissioner v. Seaboard Finance Co.,* 367 F.2d 646 (9th Cir. 1966), affg. a Memorandum Opinion of this Court; *Computing & Software, Inc. v. Commissioner,* 64 T.C. 223 (1975). Whether these requirements have been met is essentially a factual question. *Computing & Software, Inc. v. Commissioner, supra* at 232.

We conclude petitioner has demonstrated that it is entitled to deductions in amounts less than those claimed for the amortization of the price of medical records.

The nature of goodwill is the expectancy that "old customers will resort to the old place" of business. *Houston Chronicle Publishing Co. v. United States, supra; Commissioner v. Killian,* 314 F.2d 852 (5th Cir. 1963); *Boe v. Commissioner,* 307 F.2d 339 (9th Cir. 1962). The essence of goodwill is a preexisting business relationship, based on a continuous course of dealing which may be expected to continue indefinitely. *Computing & Software, Inc. v. Commissioner, supra* at 233.

The argument advanced by respondent has generally been applied in cases where the principal purchased asset was a

customer list or a similar item which had an indefinite life. *Commissioner v. Seaboard Finance Co., supra* at 652; *Manhattan Co. of Virginia, Inc. v. Commissioner, supra* at 90. But this theory is not intended to deny an allocation of a part of the purchase price to depreciable property where such property is a major factor in the transaction. *Computing & Software, Inc. v. Commissioner, supra* at 234.

The medical records here were clearly a major factor which would be relied upon by the purchaser for the production of income in the operation of the business. These records have an ascertainable value separate and distinct from goodwill or going concern.

The goodwill in this case encompassed the location of the hospital, the continued use of the name "Dr. Zaks' Dog and Cat Hospital," and the continued patronage of the hospital by pet owners within the area served.

The medical records provided an added element. From those records, the operator of the business is able to generate business by contacting the pet owners whose animals require periodic immunization and innoculation. The "repeat business" which was obtained through the use of these records was not dependent solely on the normal elements of "goodwill." These specific records do not retain their value indefinitely as part of the continuing operation of the practice. *Houston Chronicle Publishing Co. v. United States, supra; Computing & Software Inc. v. Commissioner, supra.* The records will become obsolete as animal patients die or their owners move away or change to different veterinarians. See *Rudie v. Commissioner,* 49 T.C. 131 (1967) (a pharmacist's prescription files); *Johnson v. United States,* an unreported case (W.D. Tex. 1961, 61–1 USTC par. 9278) (medical files).

These records are further differentiated from goodwill in that their value to the petitioner is as a body of factual information to be used in the treatment of patients. As such, these records are similar to the credit records, which we held to be depreciable in *Computing & Software, Inc.* In both cases, the records are valuable primarily as a resource for serving the clients of the business.

Respondent further contends that the medical records have no ascertainable cost basis because the agreement of sale was not an arm's-length agreement. But respondent only disputes

the allocation of the purchase price between goodwill and the medical records.

The contract allocates $120,500 to approximately 12,000 medical cards. Dr. Aberman estimated that approximately 6,000 of these cards represented active patients. The resulting value of $20 a card is in our opinion excessive. A test done by Dr. Robert B. Nevin, petitioner's expert in veterinary practice, indicated that in the years after petitioner acquired the practice approximately 50 percent of the business in any 1 year was new business. On this basis, approximately one-half of the intangible cost could be attributable to "goodwill" and one-half to the business attributable to the cards or for which the cards were a factor. In our opinion, the sum of $85,000 of the total purchase price should be allocated to medical records acquired in the purchase.

For purposes of depreciation, it is our opinion that such records had a useful life of 7 years. Sampling tests of the cards demonstrated that the average animal patient had a life expectancy of an additional 8.1 to 8.7 years. Additionally, petitioner's expert testified that such records normally become worthless in a shorter period of 6½ to 7 years because customers move away and change veterinarians.

*Decision will be entered under Rule 155.*