**NEWARK MORNING LEDGER CO.,**
**As Successor to the Herald**
**Company, Appellee,**

**v.**

**The UNITED STATES of**
**America, Appellant.**

**No. 90–5637.**

United States Court of Appeals,
Third Circuit.

Argued Jan. 23, 1991.

Decided Sept. 12, 1991.

As Amended on Denial of Rehearing
Oct. 15, 1991.

Albert H. Turkus (argued), Bernard J. Long, Jr., Matthew G. Weber, Dow, Lohnes & Albertson, Washington, D.C., Donald A. Robinson, Robinson, St. John & Wayne, Newark, N.J., Peter C. Gould, Sabin, Bermant & Gould, New York City, for appellee.

Shirley D. Peterson, Asst. Atty. Gen., Robert S. Pomerance (argued), Gary R. Allen, Francis M. Allegra, Steven W. Parks, Attys. Tax Div., Dept. of Justice, Washington, D.C., for appellant.

Before BECKER and HUTCHINSON, Circuit Judges, and SMITH, District Judge.*

---

\* Honorable D. Brooks Smith, United States District Judge for the Western District of Pennsyl- vania, sitting by designation.

OPINION OF THE COURT

BECKER, Circuit Judge.

This appeal by the United States from an adverse judgment of the district court in a tax refund case raises important questions concerning a taxpayer's ability to depreciate acquired intangible assets. Taxpayer/appellee Newark Morning Ledger Co. ("Morning Ledger") acquired a corporation, which itself had previously acquired the assets of eight Michigan newspapers by means of an I.R.C. §§ 332, 334(b)(2) liquidation, and which had attempted to depreciate some $67 million of the purchase price as allocated to a category denominated "paid subscribers." This amount reflected an estimate by financial and statistical experts of the present value of the future profits to be derived from the 460,000 at-will subscribers acquired in the liquidation. The Internal Revenue Service ("the Service") disallowed the depreciation deductions on the ground that Morning Ledger's predecessor could not, by sophisticated and accurate expert analysis, convert into a depreciable asset what was quintessentially goodwill—i.e., the value of the expectation of continued patronage. The tax was paid, the refund suit ensued, and, after a bench trial, the district court entered judgment for Morning Ledger. For the reasons that follow, we will reverse.

## I. FACTS AND PROCEDURAL HISTORY

Over a period of several months in 1976, the Herald Company ("Herald") purchased, through private sales and a public tender offer, all the outstanding stock of Booth Newspapers, Inc. ("Booth"), a Michigan corporation which published daily and Sunday newspapers in eight Michigan communities with a total at-will subscription of approximately 460,000.[1] In 1977, Herald liquidated the Booth stock, received all the latter's assets, and continued publishing the eight newspapers under the same names. In 1987, Herald was merged into appellee Morning Ledger, a New Jersey corporation, effectively making the operations of Herald and Booth unincorporated divisions of Morning Ledger.

Herald's 1977 liquidation of the stock of Booth was carried out pursuant to sections 332 and 334(b)(2) of the Internal Revenue Code. These sections required Herald's $328,173,154 adjusted tax basis in Booth's stock to be allocated among the various depreciable and non-depreciable assets of Booth distributed to Herald in the liquidation in accordance with the respective fair market values of the assets. Herald allocated $234,063,002 of this amount to various financial assets (cash, securities, including the stock of *Parade*, and accounts and notes receivable); and to tangible assets (land, improvements to land, buildings, production and office equipment, furniture, fixtures, vehicles, computer hardware and software). Herald allocated the remaining $94,110,152 to three intangible assets—$26,337,152 to goodwill and going-concern value combined, and $67,773,000 to a category Herald denominated as "paid subscribers." The amount earmarked as paid subscribers represented Morning Ledger's estimate of the future profits to be derived from the 460,000 at-will subscribers acquired from Booth, all or most of whom were expected to continue to subscribe to the various newspapers after the change in control.

Beginning with its 1977 tax return, Herald claimed depreciation deductions for various assets acquired in the liquidation of Booth. Consistent with applicable regulations, discussed *infra*, Herald did not attempt to claim depreciation deductions for goodwill or going concern value. On its 1977 through 1980 returns, however, Herald claimed as depreciation deductions a portion of the $67,773,000 amount allocated to paid subscribers. The Service disallowed these deductions on the ground that the amount allocated to paid subscribers

---

**1.** The eight Michigan newspapers published by Booth were the *Ann Arbor News; Bay City Times; Flint Journal; Grand Rapids Press; Jackson Citizen Patriot; Kalamazoo Gazette; Muskegon Chronicle;* and the *Saginaw News.* In addi-

tion, Booth owned the stock, valued at roughly $100 million, of the company that published the nationally-distributed Sunday newspaper magazine supplement *Parade.*

should have been included in the amount allocated to non-depreciable goodwill. The Service therefore determined that Herald owed additional taxes and interest for each of the applicable years, which Herald paid in full.

Morning Ledger, as successor to Herald, filed a timely claim for refund with the Service in 1988. After the Service failed to act upon the claim within the six month period prescribed by I.R.C. § 6532(a), Morning Ledger filed the instant action, in the district court for the District of New Jersey, to recover federal income taxes and interest erroneously assessed and collected.

The district court conducted a bench trial at which Morning Ledger argued that, under the relevant regulations and case law, discussed *infra*, in order to depreciate the paid subscribers as an intangible asset, it need only prove that the 460,000 at-will subscriber relationships acquired from Booth: (1) had limited useful lives that could be estimated with reasonable accuracy; and (2) also had ascertainable values separate and distinct from goodwill. Under Morning Ledger's interpretation of these requirements, depreciation deductions were available provided it could satisfy the essentially statistical and factual burden of demonstrating that the subscriber relationships had limited useful lives and that they had ascertainable values.

To this end, Morning Ledger presented the testimony of financial and statistical experts who explained that, based on historical and demographic data, and taking due consideration of actuarial factors such as death, relocation, changing life-styles and tastes, and competition from other media sources, they had arrived at reasonable estimates of how long the average at-will

subscriber existing in 1977 would continue to subscribe to the various newspapers. These estimates ranged from a low of 14.7 years for subscribers to the *Ann Arbor News* to a high of 23.4 years for subscribers to the *Bay City Times.*

These experts further testified that, from among the market, cost, and income approaches to valuing the existing subscriber relationships in 1977, the income approach provided the only appropriate methodology. Employing this approach, the experts testified that they first calculated the present value of the gross revenue stream that would be generated by these subscribers over their estimated useful lives. From this amount, they subtracted the projected costs of collecting that subscription revenue. The experts opined that the resultant net revenue stream, estimated by one expert as $67,773,000 and by another as $60,470,000, represented a reasonable estimate of the value of the intangible asset designated as paid subscribers.

For the most part, the Service did not contest Morning Ledger's expert evidence. Indeed, the Service stipulated to Morning Ledger's estimates of the useful lives of the subscription relationships. It did contest Morning Ledger's reliance on the *income* method of valuation, arguing that, assuming that the asset was depreciable at all, the *cost* method was the only appropriate method, and that the cost of generating 460,000 subscribers through a subscription drive was on the order of only $3 million. The Service refused, however, despite the district court's entreaties, to present expert evidence to refute Morning Ledger's estimates of the value of the subscriber relationships under the income method.[2]

---

**2.** As noted, in valuing the subscriber relationships under the income method, Morning Ledger's experts reduced the present value of the anticipated gross income stream only by the projected costs of collecting subscription fees. The district court was concerned that Morning Ledger had overstated the value of the subscriber relationships by failing to reduce the projected gross income stream from the subscribers by a pro-rata portion of the newspapers' editorial and production costs and overhead. Morning Ledger argued, in justifying its valuations, that the eight newspapers derived upwards of 80

percent of their total revenues from advertising fees. Thus, Morning Ledger argued, all the costs of putting together and printing the newspapers were expended to generate this advertising revenue. The roughly 20 percent of total revenues generated by subscribers was, under Morning Ledger's theory, essentially "gravy" and thus should be viewed as being generated without additional cost other than collection costs. The district court was suspicious, in our view justifiably so, of this reasoning. But the government refused to provide contradictory expert, valuation under the income method.

The crux of the Service's case, rather, was that Morning Ledger had misinterpreted the applicable law and that all its sophisticated financial and statistical evidence was therefore irrelevant to the fundamental legal hurdle which it could not overcome. That hurdle, in the Service's submission, is that governing law requires a taxpayer to do more than demonstrate a reasonable estimate of useful life and an ascertainable value in order to depreciate a purchased intangible asset; in addition, the taxpayer is required to demonstrate that the asset *is not goodwill*. In the Service's view, the future stream of revenues expected to be generated by the existing 460,000 at-will subscribers is the very essence of the goodwill value of the newspapers and, as such, is not depreciable.

The district court rejected the Service's argument, holding, in effect, that any asset for which a useful life could be demonstrated and a value ascertained was, by definition, not goodwill. Having reached this conclusion, and having no expert evidence before it but that of Morning Ledger, the court held that Morning Ledger was entitled to depreciate the paid subscribers account over its estimated useful lifetime based on a total value of $67,773,000, which amount the court allocated to the various daily and Sunday newspapers. The court ordered the parties to calculate, and the government to repay, all taxes erroneously paid by Morning Ledger and applicable interest thereon.

The Service timely appealed from the final judgment of the district court. We thus have jurisdiction pursuant to 28 U.S.C. § 1291. Determining whether a taxpayer has satisfied the requirements for depreciating an intangible asset is generally a factual question. *See Manhattan Co. of Virginia, Inc. v. Commissioner*, 50 T.C. 78, 92–93 (1968). Hence, we review the district court's factual findings for clear error. Of course, to the extent that the district court misinterpreted or misconstrued the governing law, our review is plenary.

## II. DISCUSSION

### A. *The Regulations, The Nature of Goodwill, and the Contentions of the Parties*

I.R.C. § 167(a) allows as a depreciation deduction a reasonable allowance for exhaustion, wear and tear, and obsolescence of property, both tangible and *intangible*, used in a trade or business. Treasury Regulation 1.167(a)–3 elaborates on the depreciation of intangibles as follows:

> If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. *No deduction for depreciation is allowable with respect to goodwill....*

26 C.F.R. § 1.167(a)–3 (emphasis added).

Case law interpreting this regulation has held consistently that, in order to qualify for depreciation of an intangible asset, a taxpayer must establish that the intangible asset (1) has an ascertainable value *separate and distinct from goodwill*, and (2) has a limited useful life, the duration of which can be ascertained with reasonable accuracy. *See, e.g., Houston Chronicle Publishing Co. v. United States*, 481 F.2d 1240, 1250 (5th Cir.1973), *cert. denied*, 414 U.S. 1129, 94 S.Ct. 867, 38 L.Ed.2d 754 (1974).[3]

---

Eventually, Morning Ledger's expert who had originally calculated the value of the subscription relationships at $67,773,000 testified that even assuming a pro-rata allocation of costs and overhead, their value would be reduced only to $61,500,000. *See* 734 F.Supp. 176, 182.

**3.** The Service itself adopted the *Houston Chronicle* test shortly after its publication. *See* Rev. Rul. 74–456, 1974–2 C.B. 65.

As we have noted, the Service essentially concedes that Morning Ledger has demonstrated that the paid subscribers have an ascertainable value and limited useful lives, and that it has presented a reasonably accurate estimate of these useful lives. In Morning Ledger's view, detailed *infra*, this concession should end the case. The Service argues, however, that Morning Ledger has ignored, and convinced the district court to ignore, the additional requirement that the value of the paid subscribers be shown to be *"separate and distinct from goodwill,"* consistent with the explicit statement in the regulations that *"[n]o deduction for depreciation is allowable with respect to goodwill."* This prohibition against depreciating goodwill, the Service notes, is nearly as old as the income tax itself, its origin being traceable to a 1927 amendment to the predecessor regulation of § 1.167(a)–3.[4]

The Service further argues that, once we recognize that the district court ignored this requirement, the error of permitting Morning Ledger to depreciate the net income stream to be generated by the 460,000 at-will subscribers becomes evident. Morning Ledger cannot demonstrate that this income stream is separate and distinct from goodwill, the Service contends, because, in fact, it is the essence of goodwill. Although goodwill is not defined in the regulations,[5] it has been repeatedly characterized in the case law as "the expectancy that old customers will resort to the old place," *Commissioner v. Killian,* 314 F.2d 852, 855 (5th Cir.1963), and as "the expectancy of continued patronage, for whatever reason," *Boe v. Commissioner,* 307 F.2d 339, 343 (9th Cir.1962). Because the projected stream of income to be generated by the 460,000 at-will subscribers is simply

---

**4.** As amended, the predecessor to § 1.167(a)–3 read:

Intangibles, the use of which in the trade or business is definitely limited in duration, may be the subject of a depreciation allowance. Examples are patents and copyrights. Intangibles, the use of which in the trade or business is not so limited, will not usually be a proper subject of such an allowance. If, however, an intangible asset acquired through a capital outlay is known from experience to be of value in the business for only a limited period, the length of which can be estimated from experience with reasonable certainty, such intangible asset may be the subject of a depreciation allowance, provided the facts are fully shown in the return or prior thereto to the satisfaction of the Commissioner. *No deduction for depreciation, including obsolescence, is allowable in respect of goodwill.*

T.D. 4055, VI–2 CB 63; Regulations 69, Art. 163 (Revenue Act of 1928) (emphasis added). This amendment followed the decision in *Red Wing Malting Co. v. Willcuts,* 15 F.2d 626 (8th Cir. 1926), *cert. denied,* 273 U.S. 763, 47 S.Ct. 476, 71 L.Ed. 879 (1927), which denied a depreciation deduction for lost goodwill to a distillery forced out of business by Prohibition.

**5.** As we have noted, the governing regulations have prohibited the depreciation of goodwill for over sixty years. *See supra* note 3. During that time, the meaning of the term "goodwill" has been litigated repeatedly, and often with high stakes, as taxpayers attempt to minimize the tax burden associated with purchased intangible assets by minimizing the amount of the purchase price allocated to nondepreciable goodwill. Despite the recurrence of the issue, neither Con-

gress, the Treasury, nor the Service has seen fit to promulgate a uniform or coherent definition of the term. Rather, the Service apparently has been content to permit the courts to wrestle, case-by-case, with the contours of this elusive concept, with the result that it wins most cases because the taxpayer cannot sustain the onerous burden of establishing value and determinable life.

We note that the absence of a clear definition of this critical term, and the resulting confusion in applying the regulations, have generated much criticism among the commentators. *See* Mundstock, *Taxation of Business Intangible Capital,* 135 U.Pa.L.Rev. 1179, 1206–07 (1987); Dubin, *Allocation of Costs to, and Amortization of, Intangibles in Business Acquisitions,* 57 Taxes 930, 933 (1979); Grigsby & Cotter, *Amortization of Certain Intangibles,* 30 U.S.C. Tax Inst. 543, 545 (1978); Gregorcich, *Amortization of Intangibles: A Reassessment of the Tax Treatment of Purchased Goodwill,* 28 Tax Law. 251, 258–59 (1975); Frank, *Goodwill is Not Immortal: A Proposal to Deduct The Exhaustion of Purchased Goodwill,* 23 J. Taxation 380, 380–81 (1965); Note, *An Inquiry Into the Nature of Goodwill,* 53 Colum.L.Rev. 660, 685–86 (1953). For the views of other commentators who have examined this troublesome corner of the tax law, *see* B. Bittker & L. Lokken, *Federal Taxation of Income, Estates and Gifts* ¶ 23.2.6, at 23–35 (2d ed. 1989); Comment, *Depreciability of Going Concern Value,* 122 U.Pa.L.Rev. 484 (1973); Note, *Amortization of Intangibles: An Examination of the Tax Treatment of Purchased Goodwill,* 81 Harv. L.Rev. 859 (1968); Schenk, *Depreciation of Intangible Assets: The Uncertainty of Death and Taxes,* 13 Wayne L.Rev. 501 (1967).

a quantification of Morning Ledger's expectation that these subscribers will continue their patronage, the Service submits that the amount is a portion of the total non-depreciable goodwill purchased from Booth.

■ We note in this regard, and the Service does not dispute, that the value of the paid subscribers would not constitute goodwill if Morning Ledger's "expectation of continued patronage" were contractually-based. *See Commissioner v. Seaboard Finance Co.*, 367 F.2d 646, 649 (9th Cir. 1966) ("[G]oodwill [is] 'the probability that old customers will resort to the old place' without contractual compulsion.") (citation omitted). Thus, if the subscribers were contractually obligated to continue subscribing for some period of time, Morning Ledger clearly would be permitted to depreciate the value of those contracts over that time period. In such an event, continued patronage would not be a mere "expectation," but a contractual right, and hence not goodwill. In the case at bar, however, all the subscribers are *terminable-at-will.* At the time of the acquisition of Booth, therefore, Herald merely expected continued patronage; it had no contractual right to demand it. Morning Ledger responds that it has not ignored the requirement that the paid subscribers be shown to have a value "separate and distinct from goodwill." Rather, Morning Ledger contends, the Service has invoked the wrong definition of "goodwill" and thus has misconstrued the requirements of § 1.167(a)–3. Morning Ledger argues that, properly defined, goodwill is no more than the residual value that remains after all assets with determinable useful lives and ascertainable values have been accounted for. Thus, by converse reasoning, anything possessing a determinable useful life and an ascertainable value is not goodwill.[6] Under Morn-

ing Ledger's definition of goodwill, in other words, the requirement that an intangible asset be shown to have a value "separate and distinct from goodwill" adds nothing to the undisputedly satisfied requirement that the taxpayer demonstrate that the asset has a limited useful life and provide a reasonably accurate estimate of that life.

Although the district court apparently sought to reconcile the competing definitions of goodwill, it is clear from the following passage that ultimately the court accepted the definition advanced by Morning Ledger over that pressed by the Service:

[T]he court recognizes and accepts that goodwill is the expectancy that former customers will be retained—that there will be continued patronage. However, one must distinguish between a galaxy of customers who may or may not return, whose frequency is unknown, and whose quantity and future purchases cannot be predicted, against subscribers who can be predicted to purchase the same item, for the same price on a daily basis. Although newspaper subscribers are under no legal obligation to continue their subscriptions, expert opinion and the evidence presented coupled with common sense and experience leads inescapably to the conclusion that the income derived from such paying subscribers will recur, which, in turn, permits the ascertainment of value separate and apart from goodwill. The income derived from the subscribers permits the calculation of value over the useful lives of the subscriptions or subscribers, and renders the subscribers acquired subject to valuation as an asset separate and apart from goodwill.

*Newark Morning Ledger Co. v. United States*, 734 F.Supp. 176, 176–77 (D.N.J.1990).

---

**6.** Morning Ledger makes this argument most forcefully in the following passage in its brief:

> The government recognizes that a "basic premise of the Regulation [§ 1.167(a)–3]" is "that goodwill has an indeterminate useful life." Given this basic premise, an asset with a "determinate" useful life cannot be goodwill under the regulation. Nevertheless, the government attempts to define "goodwill" to

include any intangible customer base asset acquired as part of a going concern, "even if it could be shown in a given case to have a finite duration." Not surprisingly, the government cites no authority for this "inference." To the contrary, . . . if an asset has a limited useful life, by definition it is no longer goodwill for purposes of depreciation.

Appellee's Brief at 32–33 (citations omitted).

B. *The Newspaper Subscriber List Cases*

In furtherance of their respective arguments, the parties call our attention principally to two cases that have considered the depreciability of acquired subscriber lists in the context of a newspaper acquisition. Because these two cases present a useful vehicle for framing the instant dispute, we will consider each in some detail.

The Service places substantial emphasis on the Fifth Circuit's decision in *Houston Chronicle Publishing Co. v. United States,* 481 F.2d 1240 (5th Cir.1973), *cert. denied,* 414 U.S. 1129, 94 S.Ct. 867, 38 L.Ed.2d 754 (1974), as an example of the correct application of § 1.167(a)–3 to determine the tax consequences of an acquisition such as the one before us. That case arose from a transaction in which the plaintiff, the publisher of the *Houston Chronicle,* paid $4.5 million for various assets, including a list of 89,000 subscribers, of its former competitor, the *Houston Press,* upon cessation of the latter's activities as a going concern. After the purchase, the *Chronicle* estimated that it would be able to use the list to contact and solicit new subscriptions from 35,600 former *Press* subscribers. Estimating further that previously it had spent roughly $2 to identify and solicit each new subscriber, the *Chronicle* assigned a value to the list of $71,200 and claimed depreciation deductions against this amount under § 167(a).

The Service disallowed the deduction on the ground that the customer list was non-depreciable under the so-called "mass asset rule," a now outdated, but then prevalent, doctrine which requires brief explanation. Until 1973, the Service successfully had persuaded the courts that documentary evidence of customer structure, such as a customer list, was generally sufficiently intertwined with goodwill, if not goodwill itself, so as to render depreciation inappropriate as a rule-of-thumb. There emerged, in support of this result, the mass asset or indivisible asset doctrine, a sort of legal fiction that customer lists, and other documentary evidence of customer structure, are presumed like goodwill to be self-regenerating and *per se* nondepreciable.[7]

---

7. Perhaps the most comprehensive statement of the theory behind the mass asset doctrine is found in *Golden State Towel and Linen Service, Ltd. v. United States,* 373 F.2d 938, 179 Ct.Cl. 300 (1967). In that case, the Court of Claims invoked the doctrine in affirming the Service's denial of depreciation deductions claimed by a linen service corporation that had acquired all of the assets of two competitors, and then sought to capitalize the portion of the purchase price attributable to acquired customer lists. The court stated:

> [Plaintiff seeks] an implausible separation of customer lists from goodwill, one a mirror reflection of the other, for goodwill=expectancy of continued patronage=customer lists=goodwill. At least, if goodwill and customer lists are not mutually coextensive, the former includes the latter, and the lesser is inextricable from the greater. In the vernacular, goodwill is a customer list with trimmings....
>
> [A] purchased terminable-at-will type of customer list is an indivisible business property with an indefinite, nondepreciable life, indistinguishable from—and the principal element of—goodwill, whose ultimate value lies in the expectancy of continued patronage through public acceptance. It is subject to temporary attrition as well as expansion through departure of some customers, acquisition of others, and increase or decrease in the requirements of individual customers. A

normal turnover of customers represents merely the ebb and flow of a continuing property status in this species, and does not within ordinary limits give rise to the right to deduct for tax purposes the loss of individual customers. The whole is equal to the sum of its fluctuating parts at any given time, but each individual part enjoys no separate capital standing independent of the whole, for its disappearance affects but does not interrupt or destroy the continued existence of the whole.

*Id.,* 373 F.2d at 942–44. For examples of other applications of the mass asset doctrine, *see Thoms v. Commissioner,* 50 T.C. 247 (1968) (denying depreciation of list of insurance expirations purchased in conjunction with sale of insurance agency as going concern on ground that list was "inextricably linked with goodwill" of seller under mass asset doctrine); *Marsh & McLennan, Inc. v. Commissioner,* 420 F.2d 667 (3d Cir.1969) (affirming Tax Court's denial of depreciation deductions for acquired insurance expirations under mass asset rule); *Skilken v. Commissioner,* 420 F.2d 266 (6th Cir.1969) (affirming Tax Court's denial of depreciation for 922 acquired oral, terminable at-will location agreements for vending machines on ground that such agreements were comparable to customer lists and thus nondepreciable as inextricably intertwined with goodwill under mass asset doctrine).

The *Houston Chronicle* filed a refund suit, contesting the Service's determination in federal district court. A jury trial was held, the *Chronicle* prevailed, and the Service appealed. The Fifth Circuit affirmed. Specifically, after reviewing many of the prior cases and reaffirming the definition of goodwill as "the expectancy that the old customers will resort to the old place," and "the expectancy of continued patronage, for whatever reason," *see supra* at 560, the court concluded, essentially rejecting the mass asset rule, that the government was incorrect in asserting that the "subscription lists [were] non-amortizable as a matter of law." *Id.* at 1248. In the passage that has become the standard for all subsequent related cases, the court went on to state:

> Without compiling the myriad cases that discuss the "mass asset" rule, we are satisfied that the rule does not establish a *per se* rule of non-amortizability in every case involving both goodwill and other intangible assets. In the light of § 167(a) of the Code and Regulation § 1.167(a)–3, we are convinced that the "mass asset" rule does not prevent taking an amortization deduction if the taxpayer properly carries his dual burden of proving that the intangible asset involved (1) has an ascertainable value separate and distinct from goodwill, and (2) has a limited useful life, the duration of which can be ascertained with reasonable accuracy.

*Id.* at 1249–50.

It is clear from this passage, the Service contends, that the two-pronged test articulated by *Houston Chronicle* was intended to inter the notion that some intangible assets, although not necessarily goodwill, were nonetheless so intertwined with goodwill as to be nondepreciable as a matter of law in all cases—i.e., the mass asset rule. The Service adds, however, that there is no indication in *Houston Chronicle* that the court intended to hold that goodwill itself was depreciable or to replace what it had confirmed to be the traditional definition of goodwill with the residual definition such as is urged by Morning Ledger in the instant dispute. Rather, the Service contends, the court merely held that in those cases where a taxpayer could demonstrate, as a factual matter, that an intangible asset such as a subscriber list was "separate and distinct" from the legal concept of goodwill—i.e., the "expectancy that old customers will resort to the old place," it ought to be permitted to do so.

As a factual matter, the Service adds, the circumstances supporting the finding that the taxpayer in *Houston Chronicle* had demonstrated that the subscriber list was "separate and distinct" from goodwill are clearly distinguishable from the instant dispute. The *Houston Chronicle* did not purchase an ongoing business or even a tradename as did Morning Ledger, but rather the idle assets of the defunct *Houston Press*. Hence, there was no "expectancy that old customers would resort to the old place" because "the old place" no longer existed. The value of the customer list to the *Houston Chronicle* therefore lay solely in its potential use as a marketing tool to solicit *new* customers to a *new* business. As such, the asset was appropriately valued at the *cost* of generating a comparable list of potential subscribers, not, as Morning Ledger has attempted, as the entire net stream of *income* such subscribers would generate if obtained. In short, the Service argues that, unlike the present dispute, there was no goodwill transferred in the acquisition of the assets of the *Houston Press* and thus no risk that goodwill would be bound up and depreciated along with the subscriber list.

In sum, contends the Service, *Houston Chronicle* presented the paradigmatic circumstances under which a taxpayer could demonstrate that a subscriber list is "separate and distinct from goodwill." The Service argues that the instant dispute, by contrast, presents a clear case wherein it is virtually impossible for the taxpayer to disentangle the potentially depreciable value of the list from the value of the nondepreciable goodwill transferred. In any event, on the record as it stands, and particularly in light of Morning Ledger's insistence on employing the income method of valuation, the Service argues that Morning Ledger

clearly has not demonstrated that the $67,-773,000 value it assigned to the list is "separate and distinct from goodwill."

Morning Ledger advances as its strongest authority the Eighth Circuit's decision in *Donrey, Inc. v. United States,* 809 F.2d 534 (8th Cir.1987). Although a much smaller transaction in absolute dollar terms than the acquisition of Booth by Morning Ledger, the case is undeniably similar to the instant dispute in terms of the material aspects of the transaction. Specifically, in *Donrey* the taxpayer purchased a small Indiana newspaper with roughly 11,000 at-will subscribers for $1,335,804 and as a going concern. The taxpayer assigned $559,406 to the newspaper's customer list/customer structure and attempted to depreciate that amount over 23 years. Although the case is not explicit on this point, it is reasonable to assume, given the amount allocated to the customer list relative to the total purchase price, that this amount was calculated under the income, rather than cost method, of valuation.

When the Service denied the depreciation deductions on the theory that the taxpayer was seeking to depreciate goodwill, the taxpayer sued for a refund in district court and demanded a jury trial. The case was submitted to the jury on special interrogatories tracking the standards of *Houston Chronicle,* and the taxpayer prevailed. A divided Eighth Circuit panel rejected the government's appeal.

The Eighth Circuit majority's reasoning is somewhat cursory, and is largely premised on the substantial deference due the jury's determination that the taxpayer had proved a value separate and distinct from goodwill. *Donrey,* 809 F.2d at 536–37. Morning Ledger argues convincingly, however, that the majority's reasoning implicitly adopted the residual definition of goodwill urged by Morning Ledger here. Indeed, this reading of the case is confirmed by Judge Bright's eloquent dissent, which takes the majority to task for ignoring the traditional definition of goodwill, and in so doing, for concluding wrongly that the taxpayer had demonstrated that the value of the customer structure was "separate and distinct from goodwill." *Id.* at 537–39 (Bright, J., dissenting).

## C. *The Case Law in Overview*

It would appear that *Houston Chronicle* and *Donrey* are directly in conflict. Before charting our own course, it therefore behooves us to look beyond the cases involving newspaper subscriber lists to the plethora of other cases that have considered the depreciability of customer or subscriber lists in other industries. This exercise, we believe, clearly indicates that the case law division is greatly overstated by Morning Ledger. Viewed in the context of the case law as a whole, there is undeniably some authority consistent with *Donrey* and supportive of the argument advanced by Morning Ledger. The overwhelming weight of the authority, however, lines up squarely behind the Service's reading of *Houston Chronicle.* Given the amount of ink that has been spilled over this subject already both in the literature, *see supra* 561, and in the case law, we will not survey the case law in detail. The following review of some of the better authorities should suffice.

Several cases support, to some degree or another, Morning Ledger's argument that any intangible asset which possesses a determinable useful life and which is capable of valuation is not goodwill. For example, a line of cases from the Court of Claims comes very close to adopting Morning Ledger's definition of goodwill. *See Meredith Broadcasting Co. v. United States,* 405 F.2d 1214, 1224–25, 186 Ct.Cl. 1 (1968); *KFOX, Inc. v. United States,* 510 F.2d 1365, 1376–77, 206 Ct.Cl. 143 (1975); *Richard S. Miller & Sons, Inc., v. United States,* 537 F.2d 446, 450–54, 210 Ct.Cl. 431 (1976). Perhaps the clearest statement of the Court of Claims' view is found in the following passage from *Richard S. Miller:*

> The term "goodwill" has a varying content, depending on its usage. Goodwill sometimes is used to describe the aggregate of all of the intangibles of a business, including such items as patents, trademarks, leases, contracts, and franchises. Since a normal rate of re-

turn usually is calculated on tangible assets only, goodwill has been used as a synonym for the return on all the intangibles of a business. In a more restricted sense, goodwill is the expectancy that the old customers will resort to the old place. It is the sum total of all the imponderable qualities that attract customers and bring patronage to the business without contractual compulsion. Another definition equates goodwill with a rate of return on investment which is above normal returns in the industry and limits it to the residual intangible asset that generates earnings in excess of a normal return on all other tangible and intangible assets. *In this court for tax purposes, the intangible value of a business is divisible into its identifiable constituent elements.... The most significant indication that an intangible asset is separate and distinct from goodwill is whether its useful life can be shown with reasonable accuracy to be of limited duration. The most important criterion is whether in fact it is a wasting asset.*

*Richard S. Miller*, 537 F.2d at 450–52 (citations omitted) (emphasis added).

There are also a few cases that, like *Donrey*, provide implicit, and consequently somewhat less persuasive, authority for Morning Ledger's asserted definition of goodwill. In *Super Food Services, Inc. v. United States*, 416 F.2d 1236 (7th Cir.1969), for example, the taxpayer, who had purchased a supermarket chain as ongoing business, was permitted to depreciate, as an intangible asset, 184 terminable-at-will retail franchise contracts acquired as part of the deal. The implicit reasoning of the court was that, having demonstrated that the contracts had limited useful lives, and having provided a reasonable estimate of those lives, the taxpayer was not obligated further to prove that the contracts were distinct from the goodwill value of the acquiree. *See also Business Service Industries, Inc. v. Commissioner*, 51 T.C.M. (CCH) 539, 543 (1986) (upholding taxpayer's claimed depreciation deductions for acquired terminable-at-will MUZAK customer contracts on implicit ground that it was sufficient that taxpayer had demonstrated that contracts had ascertainable value and useful life).

Still other cases appear confused in their analyses, ultimately providing support for both conflicting definitions advanced in the case at bar. In *Los Angeles Central Animal Hospital, Inc. v. Commissioner*, 68 T.C. 269, 273–74 (1977), for example, the Tax Court noted, consistent with the Service's position here, that goodwill is typically defined as the expectancy that "old customers will resort to the old place of business." *Id.* at 273 (citations omitted). Seemingly switching definitions of goodwill in midstream, the court then held that the taxpayer could depreciate the cost of 12,000 medical record cards purchased as part of the sale of a veterinary practice.

> From those [medical] records, the operator of the business is able to generate business by contacting the pet owners whose animals require periodic immunization and innoculation. The "repeat business" which was obtained through the use of these records was not dependent solely on the normal elements of "goodwill." These specific records do not retain their value indefinitely as part of the continuing operation of the practice.

*Id.* at 274.

The strongest authority mustered by Morning Ledger in support of its argument is the recent memorandum decision of the Tax Court in *Colorado National Bankshares, Inc. v. Commissioner*, 60 T.C.M. (CCH) 771 (1990).[7a] The case involved the depreciability of so-called "core deposits" (i.e., checking account and saving account deposits) following the acquisition of the

---

**7a.** The parties called to our attention in the Petition for Rehearing that the Eleventh Circuit has, in a published opinion, summarily affirmed the reasoning of a published Tax Court opinion, *Citizens & Southern Corp. v. Commissioner*, 91 T.C. 463 (1988), *aff'd*, 919 F.2d 1492 (11th Cir. 1990) (per curiam), which essentially tracks the reasoning of *Colorado National*. Although there now appears to be a Circuit split on this issue, for the reasons set forth in the text, we respectfully disagree with the Eleventh Circuit's position.

assets and accounts of one bank by another. On the theory that such deposits represent a valuable source of prospective income to a bank—inasmuch as the deposits are obtained at no or relatively low cost but can be continuously reinvested by the bank at higher rates of return—the acquiror bank sought to depreciate the portion of the purchase price attributable to the core deposits as an intangible asset. In an attempt to satisfy the requirements of § 1.167(a)–3, the acquiror bank employed sophisticated financial and statistical methods to estimate the average length of time that depositors would maintain their deposits and, based on these estimates, to calculate the total net value of the core deposits.

The Service responded that, in effect, the acquiror bank was attempting to depreciate the value of its expectation that the depositors would continue to patronize the bank—i.e., the value of the goodwill of the acquired bank. The Tax Court rejected the Service's position, clearly adopting the view that any intangible asset possessing a determinable life and an ascertainable value is, by definition, not goodwill.

> Goodwill, by definition, has an indefinite life and is valued using the residual method. By contrast, the deposit accounts of the acquired banks could be, and were, identified; had limited lives that could be estimated with reasonable accuracy; and could be, and have been, valued directly with a fair degree of accuracy. Moreover, petitioner's deposit accounts were not self-regenerating. Therefore, the deposit accounts were assets with values separate and apart from goodwill. It is these characteristics which separate them from general goodwill and permits separate valuation. We conclude that petitioner has proven that the core deposits intangible at issue here has an ascertainable cost basis separate and distinct from the goodwill and going-concern value of the acquired banks.

*Colorado National*, 60 T.C.M. (CCH) at 789 (citations omitted).

We could attempt to distinguish *Colorado National* and *Citizens & Southern* from the instant dispute. We believe, however, that such an exercise ultimately would prove pointless and would be somewhat disingenuous. The unavoidable fact is that there does exist authority bolstering Morning Ledger's position.

It is equally clear, however, that *Colorado National* and the other cases referenced by Morning Ledger represent no more than a minority strand amid the phalanx of cases that have considered the definition and application of the term "goodwill" in the context of § 1.167(a)–3, and which support the Service's position. *See, e.g., Brooks v. Commissioner*, 36 T.C. 1128, 1133 (1961) (defining goodwill as " 'the probability that old customers will resort to the old place' " (quoting *Horton v. Commissioner*, 13 T.C. 143, 148 (1949), *acq. and petition dismissed*, 180 F.2d 354 (10th Cir.1950))); *Boe v. Commissioner*, 307 F.2d 339, 343 (9th Cir.1962) ("essence of good will is the expectancy of continued patronage, for whatever reason"); *Nelson Weaver Realty Co. v. Commissioner*, 307 F.2d 897, 901 (5th Cir.1962) ("good will" [is] the probability that the old customers will resort to the old place"); *Commissioner v. Killian*, 314 F.2d 852, 855 (5th Cir.1963) (quoting *Nelson Weaver*); *Commissioner v. Seaboard Finance Co.*, 367 F.2d 646, 649 (9th Cir.1966) (quoting *Boe* and *Brooks*); *Golden State Towel and Line Service, Ltd. v. United States*, 373 F.2d 938, 941, 179 Ct.Cl. 300 (1967) (quoting *Boe*); *Skilken v. Commissioner*, 420 F.2d 266, 270 (6th Cir.1969) (" [Goodwill] ... is constituted in the tendency of customers to return for trade to those with whom they are accustomed to deal.' " (quoting *Burke v. Canfield*, 121 F.2d 877, 880 (D.C.Cir.1941)); *Winn–Dixie Montgomery, Inc. v. United States*, 444 F.2d 677, 681 (5th Cir.1971) ("[G]oodwill is acquired by the purchaser of a going concern where the 'transfer enables the purchaser to step into the shoes of the seller,' " (quoting *Balthrope v. Commissioner*, 356 F.2d 28, 32 n. 1 (5th Cir.1966)); *Houston Chronicle Publishing Co. v. United States*, 481 F.2d 1240, 1247 (5th Cir.1973), *cert. denied*, 414 U.S. 1129, 94 S.Ct. 867, 38 L.Ed.2d 754 (1974) (quoting *Nelson Weaver, Boe*, and *Balthrope*); *Robins & Weill, Inc. v. United States*, 382

F.Supp. 1207, 1214 (M.D.N.C.1974) (quoting *Killian); Computing & Software, Inc. v. Commissioner,* 64 T.C. 223, 233 (1975), *acq.,* 65 T.C. 1153 (1976) (essence of good-will is a preexisting business relationship, based on a continuous course of dealing, which may be expected to continue indefinitely); *Los Angeles Central Animal Hospital, Inc. v. Commissioner,* 68 T.C. 269, 273 (1977) (citing *Houston Chronicle, Killian, Boe,* and *Computing & Software, Inc.); General Television, Inc. v. United States,* 449 F.Supp. 609, 612 (D.Minn.1977), *aff'd,* 598 F.2d 1148 (8th Cir.1979) ("the expectancy of continued patronage is the essence of goodwill"); *Illinois Cereal Mills, Inc. v. Commissioner,* 46 T.C.M. (CCH) 1001, 1023 (1983), *aff'd,* 789 F.2d 1234 (7th Cir.1986), *cert. denied,* 479 U.S. 995, 107 S.Ct. 600, 93 L.Ed.2d 600 (1986) (citing *Seaboard Finance Co.* and *Computing & Software, Inc.); Banc One Corp. v. Commissioner,* 84 T.C. 476, 508 (1985), *aff'd without opinion,* 815 F.2d 75 (6th Cir.1987) (quoting *Boe); Decker v. Commissioner,* 864 F.2d 51, 54 (7th Cir.1988) (quoting *Winn–Dixie); AmSouth Bancorporation and Subsidiaries v. United States,* 681 F.Supp. 698, 712 (N.D.Ala.1988) (quoting *Houston Chronicle).*

A brief review of the application of this definition to the facts of a few of these cases demonstrates convincingly that the Service has more accurately characterized the prevailing case law in relation to the facts of the current dispute. In *General Television, Inc. v. United States,* 449 F.Supp. 609 (D.Minn.1977), *aff'd,* 598 F.2d 1148 (8th Cir.1979), for example, the taxpayer purchased two community antenna television (CATV) stations. Among the assets of the two stations were over 7,000 at-will subscriber contracts, which the taxpay-

er sought to depreciate as intangible assets. When the Service disallowed the depreciation deductions, the taxpayer paid the tax and filed a refund suit. The district court, viewing the totality of the subscriber contracts as essentially a customer or subscriber list, denied the taxpayer's request stating:

> It is true that certain types of customer or subscriber lists have an ascertainable value separate and apart from goodwill. However, in the instances in which customer or subscriber lists have been determined to have an ascertainable value separate and apart from goodwill, the lists alone carried with them no expectancy of continued patronage. In the present case, what the plaintiff purchased was more than mere subscriber lists which could be used to identify potential customers; what it purchased was customer structures which included the expectancy of continued patronage. Therefore, because the purchases of the subscriber lists were actually purchases of customer structures with the expectancy of continued patronage and because the expectancy of continued patronage is the essence of goodwill, the subscriber lists constitute non-depreciable goodwill.

*Id.* at 611–12 (citations omitted).

Similarly, in *Panichi v. United States,* 834 F.2d 300 (2d Cir.1987), the Second Circuit upheld a district court ruling that a taxpayer who purchased a list of customers from a trash collection business was entitled to depreciate the value of the list. The court was careful to note that the list was depreciable because the taxpayer had not acquired it as part of a going concern. Thus, there was no possibility that the value of the list reflected the value of the seller's goodwill. *Id.* at 301–02.[8]

---

**8.** Additionally, in *Robins & Weill, Inc. v. United States,* 382 F.Supp. 1207 (M.D.N.C.1974), one of the first cases to apply *Houston Chronicle*'s two-pronged standard, the court considered the depreciability of acquired insurance "expirations," which are essentially records of when existing policyholders' coverage will expire and thus of when an opportunity to write new policies will arise. After invoking the oft-repeated definition of goodwill as "the expectancy that old customers will resort to the old place" and "the expectancy of continued patronage, for whatever rea-

son," *Id.* at 1214, the court noted that the taxpayer had purchased expirations from two different agencies. In one of these purchases, the court reasoned, the taxpayer sought the expirations solely for their informational value, and had not purchased the rights to the prior agency's personnel, trade name, business location, or other components of goodwill. The court therefore concluded that these expirations were *not,* in fact, goodwill and thus were depreciable. The purchase of the other agency's expirations, how-

Finally, it is worth noting the decision in *AmSouth Bancorporation and Subsidiaries v. United States*, 681 F.Supp. 698 (N.D.Ala.1988), a case which, like *Colorado National,* and *Citizens & Southern* considered the depreciability of core deposits, or customer deposit base, in the context of a bank acquisition. By opting for the traditional definition of goodwill in the tax context, *AmSouth* arrives at a holding directly at odds with the Tax Court's holdings in *Colorado National, see supra* at 564, and *Citizens & Southern, see supra* n. 8. While we recognize that the validity of *AmSouth* is questionable after the Eleventh Circuit's decision in *Citizens & Southern,* we find the reasoning of *AmSouth* sufficiently persuasive and well-articulated to merit quoting from the case at length.

> When deposits are made, two accounting entries result. First, there is a debit (asset) entry for cash or its equivalent. Second, there is an equal and offsetting credit (liability) entry for the liability to the depositor. Any additional asset must be different from the cash thereby acquired. Its creation must, somehow, result from the expectation that the depositor will allow the cash, or its equivalent, to *remain* as an asset and that earnings will result therefrom. This expectation is akin to, if not tantamount, to the expectancy that "old customers will resort to the old place" of business or continued "customer patronage." The "additional" asset does not just materialize out of nowhere. It is geared to the expectancy of the *continued* deposit relationship (patronage). . . .
>
> For accounting purposes, a bank may be able to "identify" a customer deposit base even though it may not be separate and distinct from goodwill. To the extent that deposits remain after some contractually stipulated period, they result from, "continued patronage." The mere fact that the deposits themselves are identifiable, does not make their *"value"* separate and distinct from goodwill. Other facets of bank activities such as safe deposit "expectations," loan "expectations," etc. could perhaps be similarly "identified" so as to phase out the concept of goodwill. There is no indication that tax law permits or contemplates this result.

*Id.* at 720 (citations omitted) (emphasis in original).

**D.** *Conclusion*

■ We do not deny the analytic force of *Colorado National's* residual approach to defining and calculating goodwill. And there is no doubt that many of the commentators would prefer to see the Service and the case law move in this direction, in contrast to the "expectation of continued patronage" standard to which the Service clings.[9] We would be hard pressed, however, after at least thirty years during

---

ever, was made in conjunction with the complete transfer of the employees, trade name, office location, reputation, and customer structure of the acquired agency. The court therefore was of the view that goodwill of far greater value than the $10 amount claimed by the parties had been transferred in the sale. Consequently, the court held that the taxpayer had failed to satisfy its burden of demonstrating a value for the expirations that was "separate and distinct from goodwill." *Id.* at 1215.

**9.** The following passage is representative of the position taken by many of the commentators:

> In a sense, "goodwill" may be defined as all intangible commercial advantages which have not been specifically identified, valued and analyzed as to their useful lives. The sphere of acquired competitive advantages began its existence in the tax law as being composed entirely of the element labeled "goodwill." Taxpayers, lured by the prospects of cost recovery through amortization, have been able to peel away at the sphere by utilizing sophisticated and objective methods for determining the purchase price before the acquisition or for allocating the price after the fact. In this way, the taxpayer has been able to identify more and more of the intangible advantages for which he has paid money in excess of the value of tangible assets. If the trend continues, theoretically taxpayers should be able to whittle down the sphere so that the core of goodwill becomes non-existent by identifying and allocating the entire excess price to specific competitive advantages. The [only] obstacle to be hurdled for each newly-identified element will be the burden of proof regarding allocation of value and determinable life.

Gregorcich, *Amortization of Intangibles: A Reassessment of the Tax Treatment of Purchased Goodwill,* 28 Tax Law. 251, 270–71 (1975) (citation omitted).

which: (1) the Service consistently has advanced its definition; (2) courts have overwhelmingly acquiesced to it; and (3) the Congress, the Treasury and the Service, wherein reside the authority and expertise to undertake such a change, have stood mute, to take it upon ourselves to announce a sudden *redefinition of a concept so fundamental* to tax accounting. In any case, consistent with the prevailing case law, we believe that the Service is correct in asserting that, for tax purposes, there are some intangible assets which, notwithstanding that they have wasting lives that can be estimated with reasonable accuracy and ascertainable values, are nonetheless goodwill and nondepreciable. We conclude, in short, that the district court applied the wrong definition of "goodwill."

 We conclude additionally that, applying the correct definition of goodwill, it is clear that Morning Ledger has not satisfied its burden of demonstrating that the paid subscribers are "separate and distinct from goodwill." As the cases discussed *supra* demonstrate, the depreciability of customer lists, while no longer *per se* forbidden under the mass asset rule, still is limited to a narrow set of circumstances. Customer lists are generally not depreciable when acquired in conjunction with the sale of the underlying business as a going concern. In the context of the sale of a going concern, it is simply often too difficult for the taxpayer and the court to separate the value of the list *qua* list from the goodwill value of the customer relationships/structure.

 Even in those cases where customer lists have been deemed depreciable, the value assigned to the lists has been limited to the *cost* of generating a like list of potential subscribers or customers. As a general matter, the courts have not permitted customer lists to be valued as the stream of *income* to be generated by the listed customers over their remaining years of patronage. We agree. We note, moreover, that this preference for the cost approach over the income approach is not premised merely on some obscure aspect of financial theory. The difference in valuations between the cost and income approach, of course, can be substantial. In this case, the Service offered expert testimony that the 460,000 subscribers to the Booth newspapers could be valued on a cost basis at roughly $3 million, whereas Morning Ledger's experts valued the same subscribers on an income basis at over $67 million! More importantly, this difference in the two valuation approaches implicates the central legal dilemma at issue. The fact is that, when employed in the context of the sale of an ongoing concern, the income approach to valuing a list of customers inherently includes much or all of the value of the expectancy that those customers will continue their patronage—i.e., the goodwill of the acquired concern.

We do not decide whether Morning Ledger could have argued successfully that it was entitled to assign a reasonable cost basis to the list (e.g., the government's $3 million estimate of what it would cost to generate a similar list as a marketing tool) and to depreciate it as an intangible asset, notwithstanding that the list was acquired as part of a going concern. This argument has never been before the court in this case, even as an alternative claim. Morning Ledger apparently never has been satisfied to seek cost recovery on such a small portion of the premium it paid over the value of Booth's tangible assets. Instead, it gambled on persuading the court of the merits of its view of the definition of goodwill and the related case law in the hopes of securing the right to recover through depreciation some $67 million. In our view, however, under the proper definition of goodwill, the $67 million amount established by Morning Ledger is quite clearly comprised largely, if not exclusively, of amounts properly attributable to goodwill. As such, Morning Ledger has not satisfied its burden of proving a value for its so-called paid subscribers that is separate and distinct from goodwill, and the district court's finding to the contrary is clearly erroneous.

The judgment of the district court will be reversed, and the case remanded with in-

structions to enter judgment in favor of the United States.